827 A.2d 68

Charles PURNELL

v.

STATE of Maryland.

No. 46, Sept. Term, 2000.

Court of Appeals of Maryland.

June 18, 2003.

Margaret L. Lanier, Asst. Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for Petitioner.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

BELL, C.J.

The sole issue presented by this appeal is whether the appropriate unit of prosecution for the common law crime of resisting arrest is determined by the number of police officers a criminal defendant resists during an arrest or, more simply, by the arrest itself.[1]

During one episode of attempting to elude police custody, Charles Purnell, the petitioner, was charged with two counts of resisting arrest: one count for each of the two officers attempting to arrest him. The petitioner was also charged, *inter alia*, with two counts of second degree assault,[2] again

---

**1.** As framed in the petitioner's Petition for Writ of Certiorari, the issue is:

"Is the Crime of Resisting Arrest a Victim-specific or an Episode-specific Crime, That Is to Say, Is the Unit of Prosecution the Arrest, or the Officer Who Is Effecting the Arrest, or More Specifically in this Case, If a Defendant Resists Two Officers Who Are Attempting to Make an Arrest, Do Two Convictions for Resisting Arrest Lie, or Just One Conviction, Because There Is Just One Arrest?"

**2.** In 1996, the Maryland General Assembly enacted Article 27, §§ 12, 12A and 12A–1, effective October 1, 1996. 1996 Laws of Maryland, Ch. 632. Maryland Code (1957, 1996 Repl.Vol., 2000 Supp.) Article 27, § 12, provided that "[e]xcept as otherwise provided in this subheading, "assault" means the offenses of assault, battery, and assault and battery, which terms retain their judicially determined meanings." Section 12A provided as to second degree assault:

"(a) General Prohibition.—A person may not commit an assault.
"(b) Violation; penalties.—A person who violates this section is guilty of the misdemeanor of assault in the second degree and on conviction is subject to a fine of not more than $ 2,500 or imprisonment for not more than 10 years or both."

one count for each police officer. Following a bench trial, the Circuit Court for Baltimore City convicted the petitioner of both counts of resisting arrest and both counts of assault and, subsequently, imposed, as to each conviction, a ten-year term of incarceration, with all but two years suspended, to be served concurrently. In an unreported opinion, the Court of Special Appeals affirmed those judgments. This Court granted the petitioner's Petition for Writ of Certiorari. *Purnell v. State,* 359 Md. 668, 755 A.2d 1139 (2000). Because we conclude that it is inappropriate to determine the unit of prosecution for the crime of resisting arrest by reference to the number of law enforcement officers resisted, or by the number of officers put at risk by the resistance, we shall reverse the judgment of the intermediate appellate court and order that one of the petitioner's convictions for resisting arrest be vacated.

## I.

Although not married, the petitioner had a long term relationship with Ms. Terry Washington, the mother of the petitioner's four children. Despite not having shared a domicile with Ms. Washington for more than two years, the petitioner paid the mortgage on the home that she and the children shared, as well as the gas and electric bills. This case arose out of events occurring on August 12, 1998. As to those events, the petitioner and Ms. Washington tell widely differing stories. Because the court acquitted the petitioner of all of the charges related to Ms. Washington,[3] we shall rely on the

---

This provision is currently codified, without substantive change, at Maryland Code (2002) § 3–203 of the Criminal Law Article.

3. The petitioner was charged, as to Ms. Washington, with false imprisonment, assault and stalking. An additional charge of kidnapping was *nolle prossed* prior to trial. In support of those charges, Ms. Washington maintained that in the summer of 1998, she told the petitioner that she "no longer wanted a [romantic] relationship with him." Although suspecting that Ms. Washington was involved in a romantic relationship with one of her co-workers, the petitioner continued to call her and visit

petitioner's version of the events leading up to his arrest for assault and resisting arrest.

In the late afternoon of August 12, 1998, the petitioner drove to Ms. Washington's place of employment in Baltimore City, arriving as she was leaving work for the day. According to the petitioner, he did so in response to a page from Ms. Washington, in which she used a code that they had devised, indicating that Ms. Washington needed the petitioner to give her a ride home.[4] He said that he informed his co-workers that he was leaving work to pick up Ms. Washington and that he would return later. The petitioner testified that, while he was taking Ms. Washington home, they had an argument about Ms. Washington's relationship with one of her co-workers. During the argument, Ms. Washington informed the petitioner that she was having pains in her chest and that he should take her to the emergency room, whereupon he drove her to the emergency room of the University of Maryland Hospital.

At the hospital, Ms. Washington, unaccompanied, checked in with the triage nurse while the petitioner searched for a parking spot. Telling the nurse that she was the victim of

---

her at her home and place of business trying to determine whether they could still "work it out."

Ms. Washington testified that, on August 12, 1998, in the late afternoon, as she was leaving work to catch the bus home, the petitioner arrived at her job unexpectedly and angrily ordered her into his truck. After she got into the truck, the petitioner, in an angry rage, began questioning Ms. Washington in an effort to learn the identity of the man she was dating at her job. When she did not respond, Ms. Washington testified, the petitioner began to follow a truck, driven by a man whom the petitioner suspected was Ms. Washington's new romantic interest, and in which some of Ms. Washington's co-workers were riding. After the petitioner had followed the truck for a while, Ms Washington began to complain of chest pains and asked the petitioner to take her to the emergency room at the University of Maryland Hospital.

4. On cross-examination, Ms. Washington admitted that in the weeks preceding August 12, 1998 she had paged the petitioner, on "the hottest days of July," and requested rides home from work. Witnesses that testified on behalf of the petitioner corroborated the petitioner's account of being paged on various occasions by Ms. Washington for rides home from work.

domestic violence and that the perpetrator would be sitting in the waiting room, Ms. Washington asked the nurse to call the police. After Ms. Washington had returned to her seat in the waiting room and while sitting next to the petitioner, Officer Wayne Early, who was responding to a call for a "problem" at the University of Maryland Hospital emergency room, arrived. A member of the hospital staff pointed out Ms. Washington and she stood up and identified herself, saying, "[i]t was me." When Officer Early asked the petitioner for identification, the petitioner stood up and handed him his driver's license, thus complying. He refused Officer Early's request to sit down, prompted by Officer Early's perception that the petitioner was getting "fidgety" and concern "for [his] safety," however, and, after the second request, the petitioner pushed Officer Early into a wall and ran toward the hospital door, where he was met by Officer John Vogelpohl, a University of Maryland campus police officer. The petitioner and Officer Vogelpohl "went to the ground" as the petitioner attempted to flee from the emergency room waiting area. When he fled, the petitioner had not been placed under arrest or told that he was.

The petitioner managed to get out of the hospital with a "fifteen yard head start," but with the two officers in pursuit. As a result of the confrontation with, or chase of, the petitioner, Officer Early suffered a pulled muscle in his leg and Officer Vogelpohl suffered a cut on his right forearm. Having been directed there by by-standers, the officers found the petitioner in a parking lot, hiding under a pick-up truck. Concerned that the petitioner may have been armed, the officers drew their weapons and ordered the petitioner to "come out." Although he did not do so initially, after "a few commands" and with the aid of Baltimore City police officers, the petitioner did come from under the truck.

After the petitioner emerged from under the truck, the officers attempted to place the petitioner under arrest, directing him "several times . . . to place his hands behind his back." The petitioner resisted their attempts to handcuff him, by "attempt[ing] to push up," which then required the officers to push "him back down to actually get him handcuffed."

The petitioner was charged, with regard to Ms. Washington, with false imprisonment, assault and stalking. He also was charged with two counts each of assault and resisting arrest, one count of each for Officer Early and Officer Vogelpohl. After a bench trial, the petitioner was acquitted of the charges relating to Ms. Washington, but convicted of all of the charges relating to the police officers. The trial court's findings of fact supporting the guilty verdicts were summarized as follows:

"[C]ount one, resisting arrest [to Officer Early], I find that there was resisting arrest, but not at the hospital, but at the parking lot. This was a warrantless arrest and, therefore, I find the defendant guilty beyond a reasonable doubt where the evidence indicated he certainly knew that the police officers intended to place him under arrest when he was in the parking lot and under the car and that there was a scuffle whereby he clearly resisted arrest.

\* \* \* \*

"In respect to case number 598273006, the events regarding Officer John Vogelpohl, I find in respect to count one that there was a resisting arrest. I find that beyond a reasonable doubt and these, again, are events at the parking lot and not the hospital."

The petitioner unsuccessfully appealed his conviction as to Officer Vogelpohl to the Court of Special Appeals. On his direct appeal to that court, the petitioner's argued, *inter alia,* that his conviction for resisting arrest relating to Officer Vogelpohl was invalid, as a matter of law, because it was part of the same arrest being effected by Officer Early, the conviction relating to whom he did not contest. The Court of Special Appeals, rejecting the petitioner's arguments, affirmed both of the judgments. The court expressly disagreed with the petitioner's contention that he "resisted with one act on one occasion." The intermediate appellate court explained:

"[t]he trial court could have found two separate acts of resisting arrest: (1) appellant's refusal to emerge from under the vehicle when ordered to do so at gunpoint by

[Officer] Vogelpohl, and (2) appellant's attempts to 'push up' while [Officer] Early and other officers tried to handcuff him, necessitating that officers 'push him back down to actually get him handcuffed.' "

In support of his appeal to this Court, the petitioner argues that his second conviction for resisting arrest cannot, as a matter of law, be upheld because the principal act involved in the wrongful conduct—resisting—was the same act that formed the basis of his first conviction for the same offense. Put another way, the petitioner argues that the appropriate unit of prosecution for the resistance to one lawful arrest is determined by the arrest itself and that he cannot be convicted twice for the same crime. Petitioner specifically draws this Court's attention to the factual findings of the trial court that both convictions for resisting arrest were based upon his act or acts of resistance in the parking lot where he was ultimately apprehended, and exclusive of any conduct that took place in the hospital. The petitioner's argument, in substance, is a double jeopardy challenge to the prosecutor's decision to charge him with two counts of resisting arrest from purportedly a single event.[5]

---

5. The petitioner, in his brief, also asks this Court to address whether the act of resisting arrest is a crime in Maryland. Relying upon W. Hawkins, 2 Pleas of the Crown 122 (1721, 4th ed. 1762), the petitioner argues that on July 4, 1776, the date Maryland adopted the common law of England, the crime of resisting arrest did not exist in England. The petitioner points out that in 18th century England it was a crime for third parties to intervene in the arrest of a person, but "it [was] not [a] felony in the party himself, who is attacked in order to be arrested, to save himself from the arrest by such resistance." (Petitioner's Brief at 24) citing W. Hawkins, Pleas of the Crown § 1. Therefore, the petitioner maintains, the crime of resisting arrest was never inherited into the common law of this State and, thus, does not exist today. The State, while noting that the petitioner did not raise this issue in his petition for writ of certiorari, nonetheless addresses the petitioner's argument.

This Court has stated that "ordinarily [we] will not consider an issue not included in the petition for writ of certiorari." *Richmond v. State*, 330 Md. 223, 235, 623 A.2d 630, 636 (1993) citing Md. Rule 8–131(a) and (b). We have, however, held that the word "ordinarily" in Md. Rule 8–131 grants this Court discretion to address question not raised in the petition for writ of certiorari. *See also, McElroy v. State*, 329 Md.

In rebuttal, the State notes that "in most unit of prosecution cases involving statutory offenses, this Court has repeatedly stated that the critical inquiry is one of legislative intent." (Respondent's Brief at 14) (*citing Huffman v. State*, 356 Md. 622, 627, 741 A.2d 1088, 1091 (1999); *Randall Book Corp. v. State*, 316 Md. 315, 324, 558 A.2d 715, 720 (1989); *Brown v. State*, 311 Md. 426, 434, 535 A.2d 485, 489 (1988)). The State, however, attempts to persuade this Court that, absent statutory guidance, an historical review of certain authoritative writings on the common law of England, and in particular the crime of resisting arrest, instructs that the appropriate unit of prosecution is determined by each person subjected to harm, or the risk of harm by each act of resistance. Thus, the State argues that both Officers Early and Vogelpohl were either harmed, or, put at risk, by the petitioner's attempt to resist arrest. Consequently, multiple convictions for the offense of resisting arrest are appropriate, it argues. We are not persuaded by the State's argument.

## II.

This Court has stated that resisting arrest constitutes an offense at common law in this State.[6] *Preston v. Warden of*

---

136, 146, 617 A.2d 1068, 1073 (1993); *Gonzales v. State*, 322 Md. 62, 69, 585 A.2d 222, 226 (1991). We decline to exercise that discretion to answer the question the petitioner presented in its brief, but not in the Petition for Certiorari.

**6.** In so concluding, the Court in *Preston v. Warden of Maryland*, 225 Md. 628, 629, 169 A.2d 407, 408 (1961), *cert denied* 366 U.S. 974, 81 S.Ct. 1940, 6 L.E.2d 1262 (1961), relying upon Wharton's Criminal Law and Procedure and Perkins' Criminal Law, "two twentieth century textbooks" (Petitioner's Brief at 25), summarily disposed of the issue of the origin of the common law crime of resisting arrest. As we have noted, the petitioner challenges the accuracy of this statement and conclusion. The petitioner also argues that, because *Preston* was not an appeal, but rather a denial of an application for leave to appeal, the issue of the offense's origin was not fully developed in that case. Consequently, the petitioner maintains that this Court is not bound by its decision in *Preston*. As we indicated, *supra*, the petitioner failed to raise the issue in his petition for Writ of Certiorari and we shall decline to exercise our discretion to review the issue. Instead, we shall rely upon our prior holdings in *Preston* and *Busch v. State*, 289 Md. 669,

*Maryland,* 225 Md. 628, 629, 169 A.2d 407, 408 (1961), *cert. denied* 366 U.S. 974, 81 S.Ct. 1940, 6 L.Ed.2d 1262 (1961); *See also Busch v. State,* 289 Md. 669, 675, 426 A.2d 954, 957 (1981);[7] R. Perkins, Criminal Law 495–97 (2d ed.1969); 4 Wharton's Criminal Law & Procedure § 1617 (Anderson 1957). In *Busch,* by reference to an English case, we described the character of the offense of resisting arrest, as follows:

"The prisoner was indicted for cutting and wounding with intent *to resist his lawful apprehension:* the evidence showed that the prosecutor, a police constable, went with a brother officer, both being in plain clothes, and with two other policemen in uniform, to a public house, and told the prisoner that he wanted him on a charge of highway robbery. He had no warrant, but from information he had received, he thought it his duty to apprehend the prisoner. The latter asked him for further information relative to the charge, which he refused to give, and the prisoner then told

675, 426 A.2d 954, 957 (1981), that resisting arrest "constituted an offense at the common law inherited by Maryland." *State v. Huebner,* 305 Md. 601, 608 505 A.2d 1331, 1334 (1986).

7. *Roddy v. Finnegan,* 43 Md. 490, 505 (1876) was cited by *Busch, supra,* for the proposition that the offense of resisting, hindering, or obstructing an officer in the performance of his duties also constitutes a crime at common law. *Roddy* involved an action in *trespass vi et armis,* for assault and battery against a police officer for an allegedly illegal arrest. *Id.* at 500. Finnegan had been arrested by Roddy, a Baltimore City police officer, for violation of a city ordinance, the commission of which Finnegan denied. Accordingly, he alleged in his action that his arrest was illegal. Roddy defended on the ground that he was justified in using reasonable force in effecting the arrest, which he maintained was lawful. There was no allegation that Finnegan resisted arrest. The Court reversed judgment in favor of Finnegan and remanded for new trial, holding that Roddy's arrest of Finnegan was lawful. In dicta, the Court stated:

"If Finnegan had not been concerned in the violation of the ordinance, yet, if when Roddy was enquiring into the circumstances, to enable him to ascertain the offending party, Finnegan obstructed him in the discharge of his duty; such conduct was unlawful and justified Roddy in arresting him. The fact that Finnegan was under the influence of liquor, afforded no excuse for such conduct."
*Id.* at 505.

him that he would not go to the station-house, unless he was told why, or by what authority, he was apprehended. On the witness immediately proceeding to arrest him, the prisoner violently assaulted and seriously injured him.

"Robinson (for the prisoner) contended that, upon this evidence, the prisoner could not be convicted of the crime alleged against him.

"Talfourf, J.—I am of opinion, that the objection taken is not well founded. There is, upon the evidence, a sufficient case for the jury. I think that, *to support a charge of resisting a lawful apprehension, it is enough that prisoner is lawfully apprehended, and it is his determination to resist it.*"

*Busch, supra,* 289 Md. at 673–674, 426 A.2d at 956–957 (emphasis in original), quoting *Regina v. Bentley,* 4 Cox C.C. 406, 406–08 (1850). Then, referencing and quoting *Preston,* 225 Md. at 629, 169 A.2d at 408, we acknowledged that "the offense of resisting arrest ordinarily requires resistance to a lawful arrest made by an officer of the law in the performance of his official duties." *Busch, supra,* 289 Md. at 675, 426 A.2d at 957. From that premise, we emphasized that a lawful arrest was a prerequisite to the offense of resisting arrest. *Id.* In our most recent decision relating to the crime of resisting arrest, this Court approved a jury instruction, stating "that the prosecution had the burden of proving that the defendant was arrested; the arrest was lawful; and that the defendant refused to submit to that arrest." *Barnhard v. State,* 325 Md. 602, 609–610, 602 A.2d 701, 704–705 (1992). Our cases and those of the Court of Special Appeals, *see, e.g. Jordan v. State,* 17 Md.App. 201, 208, 300 A.2d 701, 704 (1973); *Lyles v. State,* 10 Md.App. 265, 268, 269 A.2d 178, 180 (1970), uniformly and consistently have stated that the offense, in the absence of statutory enactment, is a part of Maryland's common law.[8]

---

8. In a majority of our sister jurisdictions, however, the crime of resisting arrest is a statutory crime. *See* Ala.Code § 13A–10–41 (2002); Ariz.Rev.Stat. Ann. § 13–2508 (West 2002); Ark.Code Ann. § 5–54–103

■ Double jeopardy principles apply, whether a criminal defendant is charged with a common law offense or a statutory offense. *Miles v. State,* 349 Md. 215, 219, 707 A.2d 841, 843–844 (1998); *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056, 1059 (1991) ("Although *Blockburger* involved statutory offenses ... [the same test] is also the applicable standard under the common law Maryland merger doctrine."). *See also, Miles v. State, supra,* 349 Md. at 219, 707 A.2d at 843–844 (merger of common law battery and aggressive panhandling ordinance); *State v. Lancaster,* 332 Md. 385, 391, 631 A.2d 453, 456 (1993) (merger of statutory offenses); *Eldridge v. State,* 329 Md. 307, 319–320, 619 A.2d 531, 537 (1993) (merger of sentences for robbery with a deadly weapon and wearing and carrying the weapon openly and with intent to injure); *In Re Montrail M.,* 325 Md. 527, 531, 601 A.2d 1102, 1104 (1992) (applying doctrine to juvenile delinquency proceedings); *Biggus v. State,* 323 Md. 339, 350, 593 A.2d 1060, 1065 (1991) (addressing whether third degree sexual act stat-

(Michie 2001); Cal.Penal Code § 148 (West 2003); Colo.Rev.Stat. Ann. § 18–8–103 (West 2002); Del Code Ann. tit. 11, § 1257 (2002); Fla. Stat. Ann. §§ 843.01 and 843.02 (West 2003); Ga.Code Ann. § 16–10–24 (2002); Haw.Rev.Stat. § 710–1026 (2001); 720 Ill. Comp. Stat. 5/31–1 (2003); Ind.Code Ann. § 35–44–3–3 (Michie 2002); Ky Rev. Stat. Ann. § 520.090 (Michie 2002); La.Rev.Stat. Ann. § 14–108 (West 2003); Mass. Gen. Laws. ch. 268, § 32B (2002); Mich. Comp. Laws Ann. § 750.479 (West 2003); Miss.Code Ann. § 97–9–73 (2002); Mo. Rev.Stat. § 575–150 (2003); Mont.Code Ann. § 45–7–301 (2003); Neb. Rev.Stat. Ann. § 28–904 (Michie 2002); N.H.Rev.Stat. Ann. 642:2 (2002); N.J. Stat. Ann. § 2C:29–2 (West 2003); N.M. Stat. Ann. § 30–22–1 (Michie 2002); N.Y. Penal Law § 205.30 (McKinney 2003); N.C. Gen.Stat. § 14–223 (2002); Ohio Rev.Code Ann. § 2921.33 (West 2002); S.C.Code Ann. § 16–9–320 (Law Co-op.2003); S.D. Codified Laws § 22–11–4 (Michie 2003); Tenn.Code Ann. § 39–16–602 (2002); Tex. Penal Code Ann. § 38.03 (Vernon 2003); Wyo. Stat. Ann. § 6–5–204 (Michie 2001). Nonetheless, common law resisting arrest has not been codified by the legislature in this state. Only a few of our sister jurisdictions have addressed the issue of the appropriate unit of prosecution for the offense of resisting arrest. *See Wallace v. State,* 724 So.2d 1176 (Fla.1998); *State v. Good,* 851 S.W.2d 1 (Mo.Ct.App.1992); *Madison v. State,* 777 So.2d 1175 (Fla.Dist.Ct.App.2001); *State v. Floyd,* 278 Ill.App.3d 568, 215 Ill.Dec. 324, 663 N.E.2d 74 (1996); *State v. Owens,* 159 Or.App. 80, 979 P.2d 284, 287 (1999); *State v. Rose,* 7 Wash.App. 176, 498 P.2d 897 (1972).

ute established a single offense, committed in different ways, or several distinct offenses); *Williams v. State,* 323 Md. 312, 316, 593 A.2d 671, 673 (1991) (merger of attempted first degree murder and assault with intent to murder).

██ The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides the criminally accused with protection from, *inter alia,* multiple punishment stemming from the same offense.[9] *See, Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 2225, 53 L.Ed.2d 187, 194 (1977) *citing North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 665 (1969) (The Double Jeopardy Clause "protects against multiple punishment for the same offense"). Similarly, despite the lack of a double jeopardy clause in its Constitution, Maryland's common law provides protection from double jeopardy to the criminally accused. *See, Ware v. State,* 360 Md. 650, 708, 759 A.2d 764, 794–795(2000) (citing *Gianiny v. State,* 320 Md. 337, 347, 577 A.2d 795, 799 (1990); *Pugh v. State,* 271 Md. 701, 705, 319 A.2d 542, 544 (1974); *State v. Barger,* 242 Md. 616, 619, 220 A.2d 304, 306 (1966)).

██ The Double Jeopardy Clause of the United States Constitution

"protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense."

---

**9.** "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; *nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb;* nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. (emphasis added).

*Randall Book Corp., supra,* 316 Md. at 323, 558 A.2d at 719, *citing United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), *overruled by Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997); *North Carolina v. Pearce, supra,* 395 U.S. at 717, 89 S.Ct. at 2076, 23 L.Ed.2d at 665. As there has only been one prosecution in the case *sub judice,* we are concerned solely with the prohibition against multiple punishment for the same offense. A criminal defendant may raise a double jeopardy challenge, alleging multiple punishment, generally in "two different sets of circumstances: those involving two separate statutes embracing the same criminal conduct, and those involving a single statute creating multiple units of prosecution for conduct occurring as a part of the same criminal transaction." *Richmond v. State,* 326 Md. 257, 261, 604 A.2d 483, 485 (1992) *citing Gore v. United States,* 357 U.S. 386, 393–94, 78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405, 1411 (1958) (Warren, C.J. dissenting); *Randall Book Corp., supra,* 316 Md. at 324, 558 A.2d at 720. In the case *sub judice,* we are confronted with a situation where a single common law offense is alleged to have created multiple units of prosecution for conduct occurring, as the petitioner argues, from the same criminal transaction.[10]

This Court has stated:

"whether a particular course of conduct constitutes one or more violations of a single statutory offense affects an accused in three distinct, albeit related ways: multiplicity in the indictment or information, multiple convictions for the same offense, and multiple sentences for the same offense. All three turn on the unit of prosecution of the offense and this is ordinarily determined by reference to legislative intent."

*Brown v. State, supra,* 311 Md. at 432, 535 A.2d at 488 (citations omitted). The Court further opined in *Brown* that:

---

**10.** We conclude that it is irrelevant for purposes of a double jeopardy challenge whether the offenses charged are determined to be statutory crimes or common law crimes.

"[t]he unit of prosecution analysis is applicable to those multiple punishment cases which involve the construction of a single statutory provision. In determining whether two different offenses are the same for double jeopardy purposes, both in the context of merger of offenses in a single trial and successive trials for the same offense, we have generally employed the *Blockburger* required evidence test. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932). *See Dillsworth v. State,* 308 Md. 354, 356–61, 519 A.2d 1269, 1270–73 (1987); *State v. Jenkins,* 307 Md. 501, 517–18, 515 A.2d 465, 473–74 (1986); *Hawkins v. State,* 291 Md. 688, 691–92, 436 A.2d 900, 901–02 (1981); *Whack v. State,* 288 Md. 137, 141–42, 416 A.2d 265, 266–68 (1980), *appeal dismissed,* 450 U.S. 990, 101 S.Ct. 1688, 68 L.Ed.2d 189 (1981) and case cited therein."

*Brown v. State, supra,* 311 Md. at 432, n. 6, 535 A.2d at 488, n. 6.

Generally, this Court has relied upon the *Blockburger* "required evidence test" in resolving double jeopardy challenges involving two offenses stemming from the same act or acts. *Miles v. State, supra,* 349 Md. at 219, 707 A.2d at 843–844 ("We have often pointed out that, as a matter of Maryland common law, the normal standard for determining whether one offense merges into another is what is usually called the 'required evidence test.'"). *See Williams v. State, supra,* 323 Md. at 316–317, 593 A.2d. at 673 ("Under settled Maryland common law, the usual rule for deciding whether one criminal offense merges into another or whether one is a lesser included offense of the other, *as well as the usual rule for determining whether two offenses are deemed the same for double jeopardy purposes, when both offenses are based on the same act or acts,* is the so-called "required evidence test.") (emphasis added).

We outlined the application of the required evidence test in *Williams* as follows:

"The required evidence test, or "same evidence test" or "elements test" as it is sometimes called, applies to both

common law offenses and statutory offenses. *Snowden v. State, supra,* 321 Md. at 617, 583 A.2d at 1059; *State v. Ferrell, supra,* 313 Md. at 297–298, 545 A.2d at 656.

"The required evidence test 'focuses' upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter offense contains a distinct element or distinct elements, the former merges into the latter.' " *Snowden v. State, supra,* 321 Md. at 617, 583 A.2d at 1059, quoting from *State v. Jenkins, supra,* 307 Md. at 517, 515 A.2d at 473. The test was explained in *Thomas v. State, supra,* 277 Md. at 267, 353 A.2d at 246–247, as follows:

> "The required evidence is that which is minimally necessary to secure a conviction for each ... offense. *If each offense requires proof of a fact which the other does not, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy and merger purposes, even though arising from the same conduct or episode. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy and merger purposes.*"

*Williams v. State, supra,* 323 Md. at 317–318, 593 A.2d at 673 (emphasis added).

Finally, under the Maryland common law approach, the double jeopardy analysis is a two step process. According to *Jones v. State,* 357 Md. 141, 157, 742 A.2d 493, 501–502 (1999), we must first determine "whether the charges arose out of the same act or transaction, and second, whether the crimes charged are the same offense." The crimes charged are the same offense if the elements of each are identical. *Id.* at 158, 742 A.2d at 502 (citing *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932)).

"This does not end the inquiry, however, because the focus is upon the intent of the Legislature." *Jones, supra* at 158–59, 742 A.2d at 502 (noting that "the *Blockburger* rule

does not provide the final answer in cases involving multiple punishment because, when specifically authorized by the legislature, cumulative sentences for the same offense may under some circumstances be imposed after a single trial"). In such instances, the appropriate measure of the allowable unit of prosecution would be what "the legislature intended." *Huffman v. State, supra,* 356 Md. at 628, 741 A.2d at 1091. Indeed, "our primary task in a unit of prosecution analysis is to find and give effect to the legislative intent underlying the statute." *Id.* at 632–33, 741 A.2d at 1093.

### III.

■ As we have seen, the crime of resisting arrest has not been codified by the Maryland General Assembly; consequently, we are unable to determine the unit of prosecution for the offense by referring to a statute. Therefore, we believe the appropriate starting point of the unit of prosecution analysis when the offense under review is a common law crime is an examination of the elements of that crime, as, when appropriate, announced by this Court. In this case, we must review the elements of the common law crime of resisting arrest.

■ The elements of the offense of resisting arrest, we have stated, are: refusal to submit to lawful arrest and resistance to an officer of the law in the performance of his duties. *See Preston v. Warden of the Maryland House of Correction, supra,* 225 Md. at 629, 169 A.2d at 408; *Accord, State v. Huebner,* 305 Md. 601, 608, 505 A.2d 1331, 1334–1335 (1986); *Busch v. State, supra,* 289 Md. at 673, 426 A.2d at 956; and *Matter of Nawrocki,* 15 Md.App. 252, 263, 289 A.2d 846, 852 (1972) *cert. denied,* 266 Md. 741 (1972). In *Barnhard v. State, supra,* this Court, as we have seen, approved an instruction which further defined the elements of the crime that: (1) the defendant was arrested; (2) the arrest was lawful; and (3) the defendant resisted or refused to submit to that arrest." 325 Md. at 609–610, 602 A.2d at 705. We adopt the statement of the elements of the offense expressed in *Barnhard.* Unlike the statement of the elements made by the *Preston* Court,

*Barnhard's* formulation does not refer to a "law enforcement officer," as the object of the resistance.

■ No extensive analysis of the facts presented in this case is required to determine that all of the elements of the crime of resisting arrest were satisfied. The petitioner was arrested; the arrest was lawful—there was evidence that the petitioner assaulted Officer Early as he attempted to effect his escape; and, based upon the credited testimony of the officers, the petitioner resisted the arrest. Furthermore, under the "required evidence test" no element of the resisting arrest count relating to Officer Vogelpohl required additional proof that was not already furnished in the resisting arrest count relating to Officer Early. Consequently, the conclusion is inescapable, both resisting arrest counts are the same for double jeopardy purposes.

Under double jeopardy analysis, we next must ascertain whether the charges arose out of the same act or transaction. To make that determination, we refer to the "single transaction" theory this Court first enunciated in *State v. Warren,* 77 Md. 121, 26 A. 500 (1893). In *Warren,* this Court addressed the question whether a defendant who stole, at the same time, several articles of property belonging to several different owners, was guilty of but one offense or whether he was guilty of as many offenses as there were owners. In applying the single transaction theory, this Court determined that the:

> "gist of the offense ... [is] the felonious taking of the property [the act itself]. We do not see how the legal quality of the act is in any manner affected by the fact, that the property stolen, instead of belonging to one person is the several property of different persons. The offense is an offense against the public, and the prosecution is conducted, not in the name of the owner of the property, nor in his behalf—but in the name of the State, the primary object being to protect the public against such offenses by the punishment of the offender."

*State v. Warren, supra,* 77 Md. at 122, 26 A. at 500; *See also, State v. White,* 348 Md. 179, 192, 702 A.2d 1263, 1269 (1997)

(following *Warren* analysis that the theft of several articles at the same time, belonging to different owners, constitutes but one offense).

In *Bane v. State,* 327 Md. 305, 609 A.2d 313 (1992), we were asked to determine whether "separate convictions of [the statutory offense of] storehouse breaking and stealing may be sustained," where a single building, in which two separate and distinct businesses, not readily identifiable as such, were operated, was burglarized. *Id.* at 306, 609 A.2d at 313. We reversed the judgment of the Court of Special Appeals, which held that, because there were two separate businesses separated by a hallway, two separate offenses, justifying separate consecutive sentences, were appropriate. Reading the applicable statute, we noted that the statute only contemplated criminal liability for its violation when a structure determined to be an "identifiable unit" was broken. We then held that a single building in which two businesses operated, but were not separated in a manner that was objectively apparent to indicate the separate identity of the two businesses, could not make each business a separate unit of prosecution under the statute. Having determined that only one identifiable storehouse existed, we rejected the argument that a second internal breaking was sufficient to support an additional offense. *Id.* at 317, 609 A.2d at 319. Holding otherwise, we indicated, would have produced "absurd results." *Id.* at 318, 609 A.2d at 319.

More recently, we decided *Huffman v. State,* 356 Md. 622, 741 A.2d 1088 (1999). In that case, the issue presented was "whether acting as a home improvement contractor without a license on seven different occasions during a fifteen-month period constitutes one continuing violation of [Maryland Code (1992, 1998 Repl.Vol.), § 8–601 of the Business Regulation Article] or a separate violation for each transaction entered into and partially performed during that time period?" *Id.* at 625, 741 A.2d at 1089. Noting that seven different contracts existed, and seven different starts and stops in between performance, we declined to "accept petitioner's construction that these seven obviously separate and independent actions

serve as one instance of acting as an unlicensed contractor."
*Id.* at 629, 741 A.2d at 1091.

 Reading *Warren, Bane* and *Huffman* together leads
logically to the conclusion that the appropriate unit of prosecu-
tion for resisting arrest is the arrest itself. Similar to the
analysis in *Warren,* the gist of the petitioner's conduct was the
unlawful resistance to the arrest the officers were attempting
to effect. The petitioner's conduct was continuous and unin-
terrupted and the officers had not abandoned their pursuit of
the petitioner. In the case *sub judice,* the petitioner was
attempting to flee the hospital, but was not under arrest at
that time. The factual support, found by the trial court, for
the resisting arrest charges relates solely to the petitioner's
conduct in the parking lot. The trial court concluded specifi-
cally that "there was a resisting arrest, but not at the hospital,
but at the parking lot" as to the first count, and that the
second resisting arrest count was based upon, "again, . . .
events at the parking lot and not the hospital." The petition-
er's physical refusal to submit to the officers directives was
uninterrupted. Moreover, there was no break, for any appre-
ciable time, in the sequence of events, which could categorize
the counts charged as separate and distinct acts. *Accord
Harrell v. State,* 88 Wis.2d 546, 277 N.W.2d 462 (1979) (affirm-
ing two convictions of rape of same victim in the same location
because "there was a sufficient break in conduct and time
between the acts to constitute separate and distinct acts.") It
is inconceivable, under the circumstances and the State does
not argue, that the petitioner's conduct could be viewed as two
separate events. Unlike the facts in *Huffman,* the petitioner's
conduct was obviously one single and continuous course of
conduct.

Moreover, resisting arrest is, in short, an offense against
the State and not personally against the officers. Simply
because both officers were injured in the course of effecting
the arrest does not make two convictions for resisting arrest
appropriate; the proper response to that consequence lies
with the prosecution of the resister for assault against each

officer. In other words, that the resistance involves a series of related acts that are not obviously separate and independent, there being no statute requiring a contrary interpretation, or more than one officer does not constitute the offense committed other than "one continuous act."

Unlike *Bane*, there is no statute to guide our analysis of the identifiable unit of prosecution in this case, but to determine the appropriate unit of prosecution by the officers harmed or put at risk, as the State argues, would produce, as *Bane* warns against, absurd results. Under such an analysis, the petitioner could have been convicted of separate counts for each Baltimore City police officer who assisted officers Vogelpohl and Early in the parking lot, or any law enforcement officers that responded to the request for assistance as undoubtedly they were subjected to the same risk as the arresting officers.

Having determined that the two resisting arrest counts charged by the State are the same for double jeopardy purposes and that the petitioner's conduct in resisting the officers' attempt to arrest him constituted one continuous act, we hold that the petitioner is guilty of but one charge of resisting arrest, notwithstanding that there were two officers attempting to make the arrest. "If the statute creates only one offense, double jeopardy principles would require that the same acts of the defendant not be subjected to multiple punishment under the statute," *Biggus v. State, supra,* 323 Md. at 343, 593 A.2d at 1062. Analogous reasoning applies to common law offenses.

We find support for our decision in the jurisprudence of our sister jurisdictions, albeit, for the most part, construing their state resisting arrest statutes. *See Wallace v. State,* 724 So.2d 1176 (Fla.1998) (criminal defendant can be convicted only once for statutory crime of resisting arrest with violence where his resistance occurred in the course of a continuous attempt to arrest him.); *State v. Good,* 851 S.W.2d 1 (Mo.Ct.App.1992) (where defendant charged with two counts of resisting arrest, each regarding a different officer; the court stated that the gist of the offense is the resistance to the arrest, irrespective

of the number of officers attempting to make the arrest); *Madison v. State*, 777 So.2d 1175, 1176 (Fla.Dist.Ct.App.2001) ("continuous resistance to the ongoing attempt to effect a defendant's arrest constitutes a single instance of resisting an officer under section 843.01, Florida Statutes"); *State v. Owens*, 159 Or.App. 80, 979 P.2d 284, 287 (1999).

To be sure, other courts have reached different results. Reviewing these cases is instructive. Some courts have held that multiple convictions may lie for the statutory crime of resisting arrest where either the statute intended multiple punishment or the facts of the case warrant a finding that two offenses were committed. P*eople v. Floyd*, 278 Ill.App.3d 568, 215 Ill.Dec. 324, 663 N.E.2d 74 (1996); *State v. Rose*, 7 Wash.App. 176, 498 P.2d 897 (1972).

In *Rose*, for example, an intermediate appellate court in Washington concluded under that State's criminal statute that two convictions for resisting arrest by firing upon a law enforcement officer were permissible. In that case, the defendant was convicted of firing several shots from a handgun in the direction of two police officers. The Washington statute provided:

"If any person shall resist apprehension or arrest by firing upon a law enforcement officer, such person shall in addition to the penalty provided by statute for resisting arrest, be guilty of a felony and punished by imprisonment for not less that ten years, which sentence shall not be suspended or deferred."

*Rose*, 498 P.2d at 902 n. 2. Noting the language of the statute and applying the *Blockburger* test, the court concluded, and held, that each count of resisting arrest by firing upon a law enforcement officer required proof that the defendant fired upon each individual officer. Thus, the Court determined that the statute contemplated "two distinct acts" and two offenses could be established on the basis of a single act. *Id.* at 904.

Similarly, in *Floyd*, an Illinois intermediate appellate court determined that multiple convictions for the statutory offense of resisting arrest were permissible. Undoubtedly critical to

that court's determination was the statute's express inclusion of the word "peace officer." [11] *State v. Floyd, supra,* 215 Ill.Dec. 324, 663 N.E.2d at 77. The court concluded that multiple convictions are appropriate where "the record reveals that the defendant committed multiple acts of resisting arrest against four separate officers." Focusing on the facts, the court pointed out that the defendant's struggle to resist arrest spanned a "15–minute period ... and involv[ed] 'six or seven' police officers responding in waves." [12]

Notwithstanding the decisions in *Rose* and *Floyd,* other courts have found that the appropriate unit of prosecution for the crime of resisting arrest is the substantive act of undertaking a resistance to the arrest. Such was the reasoning in *State v. Good, supra,* 851 S.W.2d at 5–6, where an intermediate appellate court in Missouri, confronted with a defendant

---

**11.** The court stated that an individual commits the crime of resisting arrest when he "knowingly resists or obstructs the performance by one known to the person to *be a peace officer* of any authorized act within his official capacity." *State v. Floyd,* 278 Ill.App.3d 568, 215 Ill.Dec. 324, 663 N.E.2d 74, 77 (1996), *citing* 720 ILCS 5/31–1 (West 1993) (emphasis added).

**12.** Accord *Haight v. Texas,* 103 S.W.3d 498 (2003). While not involving the crime of resisting arrest, the Court of Appeals of Texas, recently examined whether multiple convictions for the crime of official oppression lie for an act that occurred "from the same set of events." Id. at 501. In that case a law enforcement officer was charged with three counts of the statutory offense of official oppression. Under the Texas statute, Tex. Pen.Code Ann. §§ 39.03 (Vernon 1994), official oppression occurs when "a public servant acting under color of ... office or employment intentionally commits one of a list of acts: 'subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful." Examining the offenses charged in the subject case: unlawful arrest; mistreatment; and bodily injury, the court reasoned that the

"mistreatment and bodily injury acts resemble the criminal offense of assault. Both the unlawful restraint and assault offenses are fundamentally assaultive. For assault-type offenses, the allowable unit of prosecution is the victim. In this case, because the victim is the allowable unit of prosecution of the relevant underlying acts, the allowable unit of prosecution for the offense of official oppression is also the victim."

Id. at 504 (citations omitted).

challenging two counts of resisting arrest arising out of the same incident, held:

"the gist of the offense of resisting arrest as defined by the [statute] is the action of the defendant. It is clear from the language of the statute that the General Assembly of Missouri intended to prohibit flight as one of several means of resisting arrest. The gravamen of the offense is resisting arrest, not flight from a law enforcement officer. The gist of the offense is not dependent upon how many officers were attempting to arrest the defendant."

*Id.*

Consistent with the rationale of the Missouri appellate court, the Court of Appeals of Oregon has expressly held that the statutory crime of resisting arrest is not an offense against an officer, but an offense against the public order. *State v. Owens, supra*, 979 P.2d at 287. Most notably, the Oregon court's decision to define the unit of prosecution by the offense, rather than the officer, was made despite an express reference in its resisting arrest statute to law enforcement officers. The Court explained,

"that [the statute] contemplates two culpability elements and two variable elements. The culpability elements are that: (1) The actor's conduct must be intentional, and (2) the conduct must be accompanied by knowledge that the person resisted is a peace officer. ORS 162.315(1). The variable elements involved in resisting an arrest are: (1) The degree of resistance, ORS 162.315(2)(b), and (2) the legality or illegality of the arrest, ORS 162.315(3). Those elements do not focus on the number of the officers that are resisted but on the civil disorder and disrespect for the law that is threatened by the actor's conduct. Under the statute, an individual's right to bodily security must be balanced against the interest in public order. The Commentary to the Proposed Oregon Criminal Code notes that the adoption of ORS 162.315 was intended to achieve a balance of these conflicting interests by addressing the "threat to society posed by violent street confrontations between private citizens and the police." Commentary to Criminal Law Revi-

sion Commission Proposed Oregon Criminal Procedure Code, Final Draft and Report (July 1990), §§ 206."

Moreover, the Oregon court expressly rejected any argument that the legislature's wording of the statute "unambiguously indicate[d] the legislature's intent to make the statute "a crime against a particular officer" rather than a crime against public order." *Id.* at 287, n. 2.

The Florida Supreme Court reached a similar conclusion in *Wallace v. State, supra,* 724 So.2d 1176, 1177–1181. There, the defendant challenged his convictions based on two counts of resisting an officer with violence because "the evidence showed continuous resistance of the attempted arrest in a single incident." *Id.* at 1177. In rebuttal, the State of Florida argued that the two convictions should stand because the purpose of the law was for the physical protection of law enforcement officers. Ruling for the defendant, the Florida Supreme Court resolved the case by relying upon the same reasoning employed by the United States Supreme Court in *Ladner v. United States,* 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199 (1958) (construing a similar federal statute: assault or interference with a federal officer.) In *Ladner,* the defendant appealed his conviction of two counts of assault upon federal officers for the act of firing a shotgun at two officers while they were seated in their automobile. The *Ladner* Court reasoned that to:

"permit as many offenses as there are federal officers affected 'would produce incongruous results' because the cumulative punishment imposed would be disproportionate to the actual crime committed."

*Wallace, supra,* 724 So.2d at 1179, citing *Ladner,* 358 U.S. at 177, 79 S.Ct. at 213, 3 L.Ed.2d at 205.

We agree with the Florida court's analysis:

"Defining the unit of prosecution by the number of officers involved in executing the legal duty would lead to an absurd result. Imagine an armed individual waiving his gun in the direction of the 100 officers unsuccessfully attempting to induce his surrender. Or imagine the motorist who contin-

ues · driving despite an order to pull-over, resulting in a chase involving 100 squad cars, each occupied by two officers. Is it reasonable to believe that the legislature contemplated the single acts of resistance to constitute 100 counts of resisting an officer with violence and 200 counts of resisting an officer without violence?"

*Wallace, supra,* 724 So.2d. at 1180.

■■■■ Thus, we hold that the appropriate unit of prosecution for the crime of resisting arrest is determined by the act of resisting arrest, regardless of the number of officers attempting to make the arrest.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO VACATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AS TO ONE OF THE CONVICTIONS FOR RESISTING ARREST. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**