47 A.3d 1140

**Bashawn Moneak MONTGOMERY**

v.

**STATE of Maryland.**

**No. 1063, Sept. Term, 2011.**

Court of Special Appeals of Maryland.

July 2, 2012.

358

**362**

Nancy S. Forster, Towson, MD, for Appellant.

Michelle W. Cole (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: KRAUSER, C.J., GRAEFF and WATTS, JJ.

WATTS, J.

Following a trial held on May 16, 2011, a jury in the Circuit Court for Washington County convicted Bashawn Moneak Montgomery, appellant, of one count of robbery, one count of second-degree assault, two counts of theft of property with a value of at least $500,[1] two counts of obtaining property with a value of over $500 by use of a stolen credit card,[2] and two counts of unauthorized use or disclosure of a credit card number.[3] *See* Md.Code Ann., Crim. Law Art. ("C.L.") § 3–402 (robbery); C.L. § 3–203 (second-degree assault); C.L. § 7–104(a) (theft);[4] C.L. § 8–206(a) (obtaining property by

---

**1.** Although the circuit court-as well as the parties, both at trial and on brief-used the term "over," the statute uses the term "at least[.]" *See* Md.Code Ann., Crim. Law Art. § 7–104(g)(1)(i). We will henceforth omit the phrase "with a value of at least $500" from the convictions for theft and refer to the convictions as "theft."

**2.** We will henceforth omit the phrase "with a value over $500" from the convictions for obtaining property by use of a stolen credit card and refer to the convictions as "obtaining property by use of a stolen credit card."

**3.** The jury acquitted appellant of false imprisonment.

**4.** Since the trial, C.L. § 7–104 has been amended to increase "$500" to "$1,000."

use of a stolen credit card);[5] C.L. § 8–214(a) (unauthorized use or disclosure of a credit card number).

On July 11, 2011, the circuit court sentenced appellant to fifteen years' imprisonment, with all but ten years suspended, for robbery; fifteen years' imprisonment consecutive, with all but ten years suspended, for the first count of obtaining property by use of a stolen credit card; fifteen years' imprisonment concurrent, with all but ten years suspended, for the second count of obtaining property by use of a stolen credit card; eighteen months' imprisonment concurrent for each of the two counts of unauthorized use or disclosure of a credit card number; and three years' supervised probation, with $2,120 in restitution to King's Jewelry Store as a condition of probation.[6] Appellant noted an appeal[7] raising three issues, which we rephrase:[8]

> I. Did the circuit court err by purportedly failing to swear the jury?

---

**5.** The circuit court—as well as the parties, both at trial and on brief— referred to the convictions pursuant to C.L. § 8–206(a) as convictions for "obtaining property by misrepresentation." But obtaining property by misrepresentation is prohibited by C.L. § 8–206(b), not C.L. § 8–206(a), which was the statute that the State charged appellant with violating. Thus, we refer to the convictions as "obtaining property by use of a stolen credit card."

**6.** For sentencing purposes, second-degree assault and theft merged with robbery.

**7.** By agreement of the parties on the day on which oral argument was scheduled, the instant appeal was submitted on brief pursuant to Maryland Rule 8–523(a)(1).

**8.** Appellant phrased the issues as follows:
> I. Should [appellant]'s convictions be reversed where the jury was never sworn and [appellant] did not personally waive this infringement of his Constitutional right to an impartial jury?
> II. Was the evidence insufficient to convict [appellant]?
> III. Was [appellant] improperly convicted of and sentenced for two separate counts each of theft over $500, unauthorized disclosure of credit card information and obtaining property by misrepresentation?

II. Was the evidence sufficient to support the convictions for robbery, second-degree assault, and obtaining property by use of a stolen credit card?

III. Was appellant improperly convicted of and sentenced for two separate counts each of theft, unauthorized use or disclosure of a credit card number, and obtaining property by use of a stolen credit card?

For the reasons set forth below, we answer question I in the negative. We answer question II in the affirmative. We answer question III in the affirmative as to the second conviction for theft ("Count Five") and the second conviction and sentence for obtaining property by use of a stolen credit card ("Count Seven"). We, therefore, reverse the second conviction for theft ("Count Five") and the second conviction for obtaining property by use of a stolen credit card ("Count Seven"). We vacate the sentence for the second conviction for obtaining property by use of a stolen credit card ("Count Seven").[9] We answer question III in the negative in all other respects. We, therefore, affirm all other sentences and judgments of conviction.[10]

## FACTUAL AND PROCEDURAL BACKGROUND

The acts for which appellant was convicted occurred on June 8, 2008, at King's Jewelry Store in Hagerstown, Maryland.

### Trial

At trial, as a witness for the State, Kristi Mellott testified that on June 8, 2008, she was a sales associate at King's

---

9. Appellant received two convictions, but no sentences, for theft, which merged with robbery for sentencing purposes. As a result, the second conviction for theft ("Count Five") has no sentence for us to vacate.

10. After the instant reversal, appellant will have incurred: one conviction and one sentence for robbery ("Count One"), one conviction for second-degree assault ("Count Three"), one conviction for theft ("Count Four"), one conviction and one sentence for obtaining property by use of a stolen credit card ("Count Six"), and two convictions and two sentences for unauthorized use or disclosure of a credit card number ("Count Eight" and "Count Nine").

Jewelry Store. Mellott testified that a man, whom she identified as appellant, entered the store with an unidentified man and woman. According to Mellott, appellant gave her a piece of jewelry to clean, and as she was cleaning the piece of jewelry, one of its stones fell out. Mellott offered to send out the piece of jewelry to have it fixed for free. Mellott testified that appellant declined the offer and, "seem[ing] very agitated[,]" started "trying to bargain with [her]. Maybe to give him free things or something for him having to go get [his piece of jewelry] fixed somewhere else." According to Mellott, appellant "began pointing at the cases saying he wanted things."

According to Mellott, appellant told her to keep her hands above the counter where he could see them, and every time she moved her hands, he became "hostile." Mellott testified that appellant's "voice was very strong and loud. He was very demanding of [her] to do exactly what he said. Not to leave the area." Mellott testified that appellant "told [her] to stand in a certain spot and he kept saying, 'You're going to do this,' and he told [her] not to move[.]" According to Mellott, if she did not follow appellant's directions, appellant "would start speaking louder towards [her] or demanding [her] to do things." Mellott testified that she did not feel that she was free to leave and go into the store's office because she "didn't know what [appellant] was going to do." When asked: "When you said you were scared and fearful were you fearful that you maybe hurt[,]" Mellott replied: "Yes." [11] Mellott testified that she felt "very uncomfortable. [She] was scared for [her] life because [she] didn't know what was going to happen if [she] didn't listen to" appellant.

According to Mellott, appellant pointed to a ring that was part of a bridal set that was priced around $2,000, and said, "I'll take that." Mellott testified that appellant "didn't have his ID or a credit card." The unidentified man left the store,

---

11. After Mellott said "Yes[,]" appellant objected on the ground of asked and answered, and the circuit court sustained the objection. Appellant, however, did not move to strike the response from the record.

and stood outside while holding a cell phone and a piece of paper. The man spoke into the cell phone, re-entered the store, and handed to appellant the paper—which had a credit card number and an expiration date written on it. Mellott testified that appellant, in a very "angry" voice, ordered her to type the paper's credit card number into the store's debit machine. Mellott was not supposed to enter a credit card number without the credit card, "but because of feeling threatened [she] did do it. [She] continuously asked [appellant] for his ID telling him [that she] could not do it . . . . He told [her that she] had to do it." Mellott testified that she would "never" have entered the credit card number if appellant had not acted the way that he did. Mellott testified that she "typed in a wrong number" and that appellant said, "You typed in the wrong number. Give it to me. I'll do it." Mellott then typed in the correct credit card number from the paper.

Mellott testified that the credit card number was declined and that appellant then chose another ring—the other ring in the $2,000 bridal set. Mellott testified that she charged the credit card number for $1,000, "[b]ut it was two thousand so [appellant] told [her] to do it again." Mellott rang up two separate charges for $1,000 on the credit card number from the piece of paper. According to Mellott, appellant left the store with the two rings from the $2,000 bridal set. Mellott testified that her cash register was equipped with an alarm button, which she did not press during the incident. During Mellott's encounter with appellant, one of her coworkers was in the watch repair room, a closet-sized room directly behind the jewelry counter with a door that was "always open." Mellott testified that, during the encounter, she telephoned Mary Screen, the store manager, to tell Screen that a customer "didn't have an ID and [she] didn't know what to do." According to Mellott, Screen arrived at the store no more than about ten minutes before the transaction's end.

As a witness for the State, Screen testified that on June 8, 2008, she was the manager of King's Jewelry Store and "got a phone call . . . that there[ was] something going on in the

store." According to Screen, she entered the store and saw Mellott behind the counter waiting on a customer, whom Screen identified at trial as appellant. Mellott looked "nervous" and "was shaking. She was trembling." According to Screen, appellant was "being very impatient. [She] went in and actually made the phone call to the credit card company to get it approved and [appellant] said, 'Don't waste the energy, hang up the phone.' " Screen testified that appellant made her feel "[v]ery uncomfortable" because of "[h]is demeanor. The way he was speaking." Screen testified that she had been working at the store since 1999, and had dealt with difficult customers before. Screen responded "[v]ery" when asked if she would classify appellant as "[b]eyond being difficult."

As a witness for the State, Joan Lamoy testified that, around June or July of 2008, one of her credit cards was declined. Lamoy testified that she called her credit card company and was told that her credit card was declined because of large purchases, "at least a couple thousand dollars," at a jewelry store. Lamoy testified that she never gave anyone permission to use her credit card number. According to the charging document, Lamoy's credit card number was the one that appellant used on June 6, 2008, at King's Jewelry Store.

As a witness for the State, Rhonda Maketa testified that, in 2008, she was a "point of sale coordinator" at King's Jewelry Store's corporate office. Maketa testified that credit card-holders' banks would contact her office when the credit cardholders disputed charges. Maketa testified that, in July 2008, Heartland Payment Systems—King's Jewelry Store's credit card processor—asked her office to investigate two charges that had been made on June 8, 2008, at King's Jewelry Store in Hagerstown. According to Maketa, Heartland Payment Systems believed that the credit cardholder had not authorized the two charges. The State offered into evidence, as State's Exhibit 2, a two-page document that Maketa identified as two separate requests to her office from Heartland Payment Systems for "retrieval," or documentation, of the two

$1,000 charges that had been made on June 8, 2008, at the King's Jewelry Store in Hagerstown. The circuit court admitted State's Exhibit 2 without objection. Maketa testified that Heartland Payment Systems reversed the two charges of $1,000, leaving King's Jewelry Store without the merchandise or the $2,000 in payments.

### The Jury's Impaneling

On May 16, 2011, a jury panel convened for selection of the jury for appellant's trial. Before *voir dire*, the jury panel was sworn, as follows: [12]

CLERK: Do you and each of you solemnly promise and declare that you shall true answers make to such questions, as the Court shall demand of you? If so please answer I do.

JURY PANEL [ ]: (IN UNISON) I do.

CLERK: Please be seated.

*Voir dire* ensued, and a twelve-member jury was selected. The circuit court picked a foreperson, dismissed the jury panel's remainder, and took a brief recess. The circuit court resumed, ordered the witnesses sequestered, addressed a defense motion, and summoned the jury to begin opening statements. The swearing of the jury appears nowhere in the record. The docket entries say nothing about whether or not the jury was sworn. The record reflects that neither party ever requested that the jury be sworn. After hearing all of the evidence and deliberating, the jury delivered a verdict.

### Motion for Judgment of Acquittal

After the State rested, appellant moved for judgment of acquittal, arguing, in pertinent part:

---

12. The original transcript reads simply: "(JURY PANEL SWORN)." On March 20, 2012, this Court granted appellant's Motion to Correct the Record by replacing the original transcript's words with the actual exchange that we note here.

[A]s Count 1 [robbery] goes, the State is required to establish that [appellant] took the property from the victim's [Mellott's] presence and control, that [appellant] took the property by force or threat of force and that [appellant] intended to deprive the victim of the property. Your Honor, [appellant] at this time is most concerned with the allegations as far as element number two, that [appellant] took the property by force or by threat of force. And I would argue [Y]our Honor, in addition to the original, to the first stated argument as far as a[n] incorrect victim having been listed [13] that there has been no testimony that there was a force or that there was a threat of force. Indeed the testimony that the State has heard was that, or that the State has presented, was that she might, [appellant] spoke in a tone of voice. The voice was strong. The voice was demanding. He spoke louder. She [Mellott] was uncomfortable. She never said he threatened her. She never said that he threatened her with force. Whether or not she, she very well may have been scared. The fact that she might have been scared is an element that is separate and apart from what the elements of a robbery are. Threat or threat of force. There was no[ ] testimony that there was a threat or that there was a threat of force. It's that simple. There's no[ ] testimony as to [a] weapon. There was testimony that she was. She was scared. He used a loud voice. Well that in [and] of itself [Y]our Honor I don't think is sufficient to establish the elements that are required as far as a robbery to allow Count number 1 [robbery] to go to the jury.

\* \* \*

[I]n order to establish, in order for there to be legal and sufficient evidence [of second-degree assault] to go to the jury, the State has to establish that [appellant] committed

---

**13.** As part of the motion for a judgment of acquittal as to the count of robbery, appellant argued at the conclusion of the State's case that King's Jewelry Store, not Mellott, was the robbery's victim. Appellant does not raise this issue on appeal.

the attack with the intent of placing her [Mellott] in fear. What's most important is that [appellant] had the apparent ability at the time to bring about the offensive physical contact and harm. I think that this is separate and apart from whatever her subjective belief was she believed, she was scared, she believed she was going to be hurt, I believe that's her belief as far as whether or not there was a force or a threat of force. But as far as whether or not [appellant] had the apparent ability, there was no testimony—The only testimony that the Court heard was that [appellant] was in the store. In fact, the Court actually heard testimony that there were two other people in the store, a customer and a sales clerk. There was no information that—The Court heard the information that she was behind the sales counter. There was no information that he tried to leap the sales counter. There was no information that he leaned forward. There was no testimony whatsoever that he in any way, shape or form, had the ability to carry forth this assault, number one. Number two, or I guess it's element number three, is that she [Mellott] reasonably feared immediate contact.

Again, my position would be and based on what the Court's ruling is that she may have had a subject[ive] belief of this or whether or not this belief was reasonable. I don't believe that it was a reasonable belief. There were three, 2 other people in the store. Nobody called the police so I'm not sure how reasonable her belief was. Again, I believe it was a subjective belief.

\* \* \*

Your Honor, so far as Count 4 [theft] and Count 5 [same] we would submit on the evidence that has been presented so far. 6 [obtaining property by use of a stolen credit card], 7 [same], 8 [unauthorized use or disclosure of a credit card number], and 9 [same] [we] also submit with the argument that we don't believe there has been legally sufficient evidence as far as all the elements that are required under the

obtaining property by theft or misrepresentation or as well as the unlawful disclosing of a payment device number. The circuit court denied the motion as to all counts.

## DISCUSSION

### I.

### Swearing of the Jury

#### (1) Contentions

Appellant contends that the circuit court erred in failing to swear the jury. Appellant argues that "[t]here is plainly a difference between administering an oath to prospective jurors prior to *voir dire*, and swearing twelve impaneled jurors." Appellant asserts that, "[b]ecause the jurors who were ultimately selected to hear [appellant]'s case were never sworn to well and truly hear the evidence, follow the [circuit court]'s instructions and reach a fair verdict, [appellant]'s right to an impartial jury was improperly denied[.]"

The State responds that appellant "has failed to rebut the presumption of regularity in the present case [because, a]lthough the record does not affirmatively show that the jury was sworn, [appellant has] not overcome the presumption that the jury was, in fact, given the oath." The State contends that, "other than noting the absence of the oath in the record, [appellant] has not offered any evidence to support his claim that the jury was not sworn." The State argues that "there were no affirmative statements by counsel or the [circuit] court on the record and no motion for a new trial alerting the [circuit] court to any problem. Indeed, the first complaint regarding the swearing of the jury comes on appeal." The State asserts that "[t]he mere fact that the record fails to show an affirmative statement indicating that the jury was sworn does not automatically invalidate the verdict." Alternatively, the State concedes that, "[i]f this Court should find that [appellant] has established that the jury was not sworn in the present case, the proper remedy is to remand the case for retrial[.]"

In a reply brief, appellant contends that, in *Harris, infra,* the Court of Appeals did not hold that a presumption of regularity applies to the issue of whether the jury was sworn. Appellant argues that "the record must affirmatively show that the jury was sworn, that there is no 'presumption of regularity' regarding the swearing of the jury and that he does not bear any burden other than to show that there is no swearing of the jury in the transcript." Appellant asserts that, assuming *arguendo* that there is a presumption of regularity, he "has rebutted that presumption" because "the transcript lack[s] any affirmative swearing of the selected petit jury."

### (2) Law

### (a) Requirement to Swear the Jury

Maryland Rule 4–312(g)(1) provides, in pertinent part: "The individuals to be impaneled as sworn jurors ... shall be sworn." Maryland Rule 4–312(g)(1) "represents the codification of a long-standing common law requirement." *Harris v. State,* 406 Md. 115, 124, 956 A.2d 204 (2008).[14]

 In *Harris, id.* at 132, 956 A.2d 204, the Court of Appeals reversed the defendant's convictions and remanded for a new trial where "the jury which convicted the [defendant] was never sworn[.]" In *Harris,* after *voir dire* was conducted, jurors were chosen, and a foreperson was selected, the following exchange occurred:

"Defense Counsel: Your Honor, is the Jury going to be sworn?

"The Court: They're going to lunch. Why?

"Defense Counsel: I was just asking if they will be sworn.

"The Court: They are excused until 1:30."

*Id.* at 118–19, 956 A.2d 204. "The transcript [did] not reflect that the jury was sworn once they returned from lunch or that

---

**14.** Although Maryland Rule 4–312 has been amended since *Harris,* its pertinent language remains unchanged.

the jury was ever sworn thereafter." *Id.* at 119, 956 A.2d 204. The unsworn jury convicted the defendant, who moved for a new trial on the ground that the jury had never been sworn. *Id.* at 119–20, 956 A.2d 204. The trial court denied the defendant's motion, and the Court of Appeals reversed. *Id.* at 118, 122, 956 A.2d 204. The Court held:

> ... Article 21 of the Maryland Declaration of Rights requires, *inter alia,* that in a criminal prosecution, the accused is entitled to "trial by an impartial jury, without whose unanimous consent he ought not to be found guilty." Courts have held that a sworn jury is an element of an "impartial" jury and is necessary for a "legally constituted" jury.
>
> . . .
>
> Consequently, the failure to administer the oath to the jurors in the case at bar was clearly error.

*Id.* at 125–27, 956 A.2d 204. The Court held that "there was no waiver of [the defendant]'s objection to the unsworn jury," *id.* at 122, 956 A.2d 204, because "[d]efense counsel twice called the trial [court]'s attention to the failure to swear the jury" on the day of trial, *id.* at 130, 956 A.2d 204, and, after the jury delivered a verdict, moved for a new trial on the ground that the jury had never been sworn. *Id.* at 119, 956 A.2d 204. Nonetheless, the Court stated: "[P]rinciples of waiver and harmless error are inapplicable when a jury in a criminal case has never been sworn. . . . [T]he administration of the oath is an essential ingredient of a legally constituted jury and an impartial jury." *Id.* at 129, 956 A.2d 204. The Court stated that "**a jury which has never been sworn falls into the same 'structural error' category as a defective reasonable doubt instruction,** the denial of a right to a jury trial, the total deprivation of counsel, discrimination in the selection of juries, etc." *Id.* at 130, 956 A.2d 204 (emphasis added). "A structural error is one that amounted to structural defects in the trial itself." *Boulden v. State,* 414 Md. 284, 308, 995 A.2d 268 (2010) (citation and internal quotation marks omitted). Structural error cannot be harmless. *Id.* at 307, 995 A.2d 268 (citations omitted).

In *Alston v. State,* 414 Md. 92, 96, 109, 994 A.2d 896 (2010), the Court of Appeals affirmed the defendant's convictions, determining that a "belated administration of the oath to jurors" constituted harmless error. The Court stated:

We agree with the majority view that draws a distinction between (1) a jury which is never sworn or not sworn prior to deliberations, and (2) a jury that is belatedly sworn, but the oath is administered before the commencement of jury deliberations. As previously discussed, the reasons for treating the former as structural error do not apply to the latter. Accordingly, in the latter situation, the error is subject to a harmless error analysis. Where the defendant is not prejudiced by the delay, the late administration of the oath will ordinarily cure the error.

*Id.* at 107, 994 A.2d 896.

### (b) Presumption of Regularity

In *Harris,* 406 Md. at 122, 956 A.2d 204, the Court of Appeals discussed the presumption of regularity generally, stating:

There is a presumption of regularity which normally attaches to trial court proceedings, although its applicability may sometimes depend upon the nature of the issue before the reviewing court. *See, e.g., United States v. Morgan,* 346 U.S. 502, 512, 74 S.Ct. 247, 253, 98 L.Ed. 248, 257 (1954) ("It is presumed the [trial court] proceedings were correct and the burden rests on the [challenger] to show otherwise"); *Skok v. State,* 361 Md. 52, 78, 760 A.2d 647, 661 (2000) ("[A] presumption of regularity attaches to the criminal case"); *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105, 110 (1993) [ ("[W]e are conscious of the strong presumption that judges properly perform their duties") ]; *Schowgurow v. State, supra,* 240 Md. [121,] 126, 213 A.2d [475,] 479 [ (1965) ("There is a strong presumption that judges and court clerks, like other public officers, properly perform their duties") ]. Nonetheless, the presumption of regularity is rebuttable. *Beales v. State, supra,* 329 Md. at 274, 619 A.2d at 110–111. ("[W]hen viewed as a whole," the "record thus

demonstrates" that the presumption of regularity was rebutted).

(Some alterations in original). In *Harris,* 406 Md. at 124, 956 A.2d 204, the Court of Appeals held that "any presumption of regularity was overcome" because:

The trial transcript clearly shows that the jury was not sworn before the jurors were dismissed for lunch. When the jury reconvened after lunch, the transcript reveals that the Circuit Court proceeded directly with opening statements, without the oath being administered to the jury. According to the trial transcript, which the official reporter of the Circuit Court certified as being "complete and accurate," the jury was not sworn at any point during the trial. **The docket entry stating that the jury was not sworn reinforces the accuracy of the transcript.**

*Id.* at 122–23, 956 A.2d 204 (emphasis added). The Court discussed *United States v. Pinero,* 948 F.2d 698 (11th Cir. 1991), in which, according to the Court of Appeals:

[T]he argument that the jury was not sworn was made for the first time on appeal, and **the [federal] appellate court pointed out that there were no statements by trial counsel, the court reporter, or anyone else present at the trial, that the jury had not been sworn.** In this context, the federal appellate court simply stated that "[t]he mere absence of an affirmative statement in the record . . . is not enough to establish that the jury was not in fact sworn." *Pinero,* 948 F.2d at 700.

The record in the present matter offers substantially more than the record in *Pinero* to establish that the jury was not sworn. **The docket entries contain the affirmative statement that the jury was not sworn.** The trial transcript also shows two inquiries from defense counsel regarding the unsworn jury, in addition to an inquiry from the courtroom clerk.

*Harris,* 406 Md. at 123, 956 A.2d 204 (emphasis added) (second alteration in original).

### (3) Analysis

### (a) Presumption of Regularity as
### to the Swearing of the Jury

As there is an absence in the record of any information affirming or negating the administration of the oath to the jury, we must ascertain whether the presumption of regularity in trial court proceedings applies to the issue of whether the jury was sworn. After careful consideration of the holding of the Court of Appeals in *Harris*, and authorities from Maryland and other jurisdictions, we are convinced that the presumption of regularity applies to the issue of whether a jury has been sworn. In *Harris*, 406 Md. at 123–24, 956 A.2d 204, the Court of Appeals identified the following circumstances that, in combination, overcame "any presumption of regularity," *i.e.* that the jury had been sworn: "The docket entries contain[ed] the affirmative statement that the jury was not sworn[, and t]he trial transcript also show[ed] two inquiries from defense counsel regarding the unsworn jury, in addition to an inquiry from the courtroom clerk." Because of these four references to the jury being unsworn, the Court held that the defendant "did establish that the jury was not sworn[.]" *Id.* at 122, 956 A.2d 204.

After concluding that the defendant had established that the jury was not sworn, the Court of Appeals discussed cases from other jurisdictions and declined to express an opinion with respect to the presumption of regularity. *Id.* at 124 n. 1, 956 A.2d 204. The Court stated:

> Since the Court of Special Appeals and the arguments in this Court have focused on whether the presumption of regularity was overcome, we have dealt with the issue on this basis. We point out, however, that there is authority holding that the record must affirmatively show that the jury was sworn. *See, e.g., Slaughter v. State*, 100 Ga. 323, 329, 28 S.E. 159, 161 (1897) (" '[T]he fact of swearing [the jurors] must appear on the record' "); *State v. Frazier*, 339 Mo. 966, 980, 98 S.W.2d 707, 715 (1936) ("[I]t is imperative that the jury be sworn to try the cause and that the record

show it"); *State v. Mitchell*, 199 Mo. 105, 108, 97 S.W. 561, 562 (1906) ("[I]t is everywhere held that the record proper in a criminal appeal must show that the jury was sworn to try the cause"); *State v. Moore*, 57 W.Va. 146, 148, 49 S.E. 1015, 1016 (1905) ("[A] person cannot be legally convicted unless the record shows that the jury which tried the case were sworn according to law"). Moreover, most of the cases in other states, dealing with the issue of whether jurors were sworn, have not considered the issue in terms of a presumption of regularity. **Nevertheless, we need not, and therefore do not, express an opinion with respect to this matter. We have simply assumed, arguendo, that a presumption of regularity is applicable to the issue of whether the jury was sworn.**

*Harris*, 406 Md. at 124 n. 1, 956 A.2d 204 (emphasis added) (some alterations in original). With this discussion, the Court of Appeals identified four cases, the most recent of which was decided in 1936.[15] *Id.* All four of these cases predate the four cases that, the Court of Appeals determined, support the proposition that "[t]here is a presumption of regularity which normally attaches to trial court proceedings, although its applicability may sometimes depend upon the nature of the issue before the reviewing court." *Id.* at 122, 956 A.2d 204. The four former cases were all decided by courts of other States, while the four latter cases were decided either by the United States Supreme Court or the Court of Appeals.

■ Ultimately, in *Harris*, 406 Md. at 123, 956 A.2d 204, the Court of Appeals pointed out that in *Pinero*—a case upon which the State and this Court relied—the United States Court of Appeals for the Eleventh Circuit determined that the defendant had failed to show that the jury had not been sworn. The federal appellate court stated:

---

**15.** The advanced age of these four cases discounts their persuasive value not only on general principle, but also because, in the seventy-six years that have passed since the latest of the four cases, trial practice has become so much more standardized that the presumption of regularity is much stronger today than it would have been when the four cases were decided.

> The mere absence of an affirmative statement in the record, however, is not enough to establish that the jury was not in fact sworn....
>
> In the end, then, we are left with an issue of fact—whether the [trial] court administered the oath to the jury. [An appellate] court, however, is not the appropriate body to resolve factual issues. When the factual issue is raised for the first time on appeal, this is especially true.

*Pinero*, 948 F.2d at 700 (emphasis added) (citations omitted). In *Harris*, 406 Md. at 123, 956 A.2d 204, the Court of Appeals concluded that the record on appeal "offer[ed] substantially more than the record in *Pinero* to establish that the jury was not sworn." Although the Court declined to express an opinion as to the applicability of the presumption of regularity, *id.* at 124 n. 1, 956 A.2d 204, a fair reading of *Harris* is that the absence of an affirmative statement in the record is not enough to establish that a jury is unsworn. From this logic, we conclude that the presumption of regularity applies to the issue of whether a jury has been sworn.

Our conclusion is bolstered by the holdings of the Court of Appeals in *Nicolas v. State*, 426 Md. 385, 44 A.3d 396 (2012), and *Black v. State*, 426 Md. 328, 44 A.3d 362 (2012). In *Nicolas*, 426 Md. at 419, 44 A.3d 396, the Court held that the defendant failed to overcome the presumption of regularity as to whether or not the trial court received a certain note from the jury during deliberations. Although the note was part of the record, the note "was never mentioned in the trial transcript, it was never marked as an exhibit, it was never responded to by the [trial] court, and it contained no date or time-stamp." *Id.* at 399, 44 A.3d 396. The Court stated

> [T]here is a presumption of regularity which normally attaches to trial court proceedings, although its applicability may sometimes depend upon the nature of the issue before the reviewing court. *Harris v. State*, 406 Md. 115, 122, 956 A.2d 204, 208 (2008) (citations omitted). **To overcome the presumption of regularity or correctness, the [defendant] has the burden of producing a sufficient factual record**

for the appellate court to determine whether error was committed.

*Id.* at at 416, 44 A.3d 396 (emphasis added) (citations and internal quotation marks omitted).

In a similar opinion, *Black*, 426 Md. at 337, 342, 44 A.3d 362, the Court of Appeals held that the trial court did not err in failing to inform the defendant of a jury note which appeared in the record, but was neither dated, time–stamped, nor mentioned in the transcripts. The Court stated: "[T]here is a presumption, under [Maryland] Rule 4–326(d), that written jury communications that are received by the trial court will be dated and time-stamped and that the time of any oral communications will be noted in the record." *Id.* at 370–71, 44 A.3d 362. Maryland Rule 4–426(d) provides in pertinent part: "All ... communications between the [trial] court and the jury **shall be on the record in open court or shall be in writing and filed in the action.** The [courtroom] clerk or the [trial] court **shall note on a written communication the date and time it was received from the jury.**" (Emphasis added).

Pursuant to *Black*, 426 Md. at 369–70, 44 A.3d 362, where a Maryland Rule mandates that a trial court or courtroom clerk take a certain procedural action—and the record on appeal contains no information that negates the occurrence of that procedural action—there is a rebuttable presumption that the trial court or courtroom clerk took that procedural action. Unless the record offers contrary information, there is a rebuttable presumption that the jury in a criminal case was sworn pursuant to Maryland Rule 4–312(g)(1), which provides in pertinent part: "The individuals to be impaneled as sworn jurors ... **shall be sworn.**" (Emphasis added).

We find persuasive *State v. Mayfield*, 235 S.C. 11, 109 S.E.2d 716, 723–24 (1959), in which the Supreme Court of South Carolina held that the defendant had failed to show that the jury had not been sworn where, as here, the record was devoid of any mention of the swearing of the jury. The Supreme Court of South Carolina stated:

> **Absence of affirmative statement in the transcript that the jury was sworn furnishes no factual support for [the defendant]'s contention that it was not.** [The defendant]'s statement that the jury was not sworn stands alone, and is, in our opinion, insufficient to overcome the contrary presumption. But if indeed the jury was not sworn, that was a fact known to [the defendant] during the trial and which he should then and there have called to the attention of the trial [court]. His contention, made for the first time more than eight years afterwards, comes too late. One may not take his chance of a favorable verdict and, after an unfavorable one, raise an objection that should have been made before the verdict was rendered.

*Id.* (emphasis added) (citations omitted).

Agreeing with the logic of *Harris, Pinero,* and *Mayfield,* and applying the holdings of *Nicolas* and *Black,* we hold that the presumption of regularity applies to the issue of whether or not a jury has been sworn.

■ Having determined that the presumption of regularity applies to the issue of whether or not a jury has been sworn, we conclude that appellant failed to rebut the presumption.[16] The record is devoid of any affirmative indication that the jury was unsworn. Neither the docket entries nor the transcript contain an affirmative statement that the jury was unsworn. The record is devoid of any mention by the attorneys or the courtroom clerk as to the jury not being sworn. According to the instant case's transcript, the circuit court took a twenty-four-minute recess before proceeding to opening statements. The record leaves open the possibility that the jury was sworn during that twenty-four-minute timeframe—or at some other time not on the record. Appellant points us to no affirmative evidence—and we find none in the record—that the jury was

---

**16.** Appellant correctly notes that the courtroom clerk administered an oath to the jury pool before *voir dire,* and that this oath cannot substitute for the oath that is administered to selected jurors. Whether or not the *voir dire* oath was administered, however, is of zero guidance in determining from the record whether the jury was sworn after being selected.

unsworn. For the reasons discussed above, appellant failed to rebut the presumption that the jury was sworn, and thus, has failed to show any error on the part of the circuit court.[17]

■ Our holding discourages "defense gamesmanship" by ensuring that a defendant will not be able to get "a 'free look'

---

**17.** Although appellant failed to raise the issue of the purportedly unsworn jury at trial as required by Maryland Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]"), the State does not argue that the issue is not preserved for appellate review. Nonetheless, we observe that the issue of an unsworn jury, although structural error, would be subject to plain error review where the issue is unpreserved. *See Savoy v. State,* 420 Md. 232, 241–42, 243 n. 4, 22 A.3d 845 (2011) (The Court of Appeals applied the Maryland Rule 8–131(a) requirement of preservation to a structural error and stated: "[U]n-preserved structural errors are not automatically reversible, but, instead, are subject to plain error review.").

Although in *Harris,* 406 Md. at 129, 956 A.2d 204, the Court of Appeals stated that the "principle[] of waiver [is] inapplicable when a jury in a criminal case has never been sworn[,]" this statement was *dicta* because the issue of the unsworn jury had been preserved for appellate review. *Id.* at 130, 956 A.2d 204 ("[T]here would be no waiver in the present case[ because d]efense counsel twice called the trial [court]'s attention to the failure to swear the jury."); *see also id.* at 122, 956 A.2d 204 ("**We shall hold . . . that there was no waiver** of [the defendant]'s objection to the unsworn jury[.]" (Emphasis added)). In contrast, the Court's statement in *Savoy,* 420 Md. at 243 n. 4, 22 A.3d 845—"[U]n-preserved structural error[ is] not automatically reversible, but, instead, [is] subject to plain error review"—is binding because it applied to the facts in *Savoy,* in which the defendant—as did appellant—failed to object to a structural error. *Id.* at 243, 22 A.3d 845. In any event, the holding of *Savoy*—which postdates *Harris* by three years—supersedes *Harris.* Where the issue of whether the jury has been sworn is not preserved—even if the presumption of regularity is overcome—rather than automatically reversing, we would determine whether to exercise plain error review. *Savoy,* 420 Md. at 243 n. 4, 22 A.3d 845.

The instant case's circumstances would fail plain error review's fourth prong, as set forth in *State v. Rich,* 415 Md. 567, 578, 3 A.3d 1210 (2010), because an unsworn jury may be readily corrected. As evidenced by *Alston,* 414 Md. at 96, 994 A.2d 896, an unsworn jury may be readily corrected by a belated administration of the oath—and we should "not exercise our right to take cognizance of and correct any plain error material to the rights of [appellant], of our own motion, **if the alleged error was one that might have been readily corrected if it had been called to the [circuit court]'s attention.**" *Morris v. State,* 153 Md.App. 480, 510, 837 A.2d 248 (2003) (emphasis added) (citation and internal quotation marks omitted).

at the State's case-in-chief" by deliberately not objecting to the trial court's failure to swear the jury. *Boulden,* 414 Md. at 306, 995 A.2d 268 ("[I]f the failure to object is, or even might be, a matter of strategy, then overlooking the lack of objection simply encourages defense gamesmanship." (Citation and internal quotation marks omitted)); *see also Mayfield,* 109 S.E.2d at 724 (The Supreme Court of South Carolina rejected the defendant's argument that the jury had been unsworn because "[o]ne may not take his chance of a favorable verdict and, after an unfavorable one, raise an objection that should have been made before the verdict was rendered."). To hold otherwise would allow—and even encourage—defendants to refrain from calling readily corrected errors to the trial court's attention, and to attempt to avail themselves of automatic reversals on appeal.[18]

---

**18.** Nothing in this opinion encroaches upon the holding of the Court of Appeals in *Harris,* 406 Md. at 131, 956 A.2d 204, that "the harmless error principle is inapplicable when a jury in a criminal case is never sworn." *See also Boulden,* 414 Md. at 307, 995 A.2d 268 (The Court of Appeals held that structural error cannot be harmless.). Harmless error does not apply where the issue of an unsworn jury is preserved **and** the presumption of regularity is rebutted—*i.e.* it is established that the jury was unsworn.

As the Court of Appeals observed in *Harris,* 406 Md. at 131, 956 A.2d 204, where a defendant is acquitted by an unsworn jury, the "defendant runs the risk that the State may attempt to prosecute a second time for the same offense[,]" because jeopardy did not attach in the absence of the jury being sworn. The Court identified *Spencer v. State,* 281 Ga. 533, 640 S.E.2d 267, 267–68 (2007), *cert. denied,* 551 U.S. 1103, 127 S.Ct. 2914, 168 L.Ed.2d 243 (2007), a case in which the Supreme Court of Georgia held that the defendant could be prosecuted a second time after being found not guilty by an unsworn jury, as illustrative of this outcome. In the instant case, we need not reach the issue of whether double jeopardy bars retrial after an acquittal in a trial with an unsworn jury. We would, however, discourage the occurrence of the circumstance and, as the Court of Appeals observed in *Harris,* 406 Md. at 131, 956 A.2d 204, we cannot guarantee that the Fifth Amendment's Double Jeopardy Clause would not bar a second prosecution after an unsworn jury acquitted a defendant.

## II.

## Sufficiency of the Evidence

### (1) Contentions

Appellant contends that the circuit court erred in holding that there was sufficient evidence to support the convictions for robbery, second-degree assault, and obtaining property by use of a stolen credit card. Appellant argues that there was insufficient evidence to sustain the conviction for robbery because the State "failed to prove that a reasonable person under the same circumstances [as Mellott] would have felt apprehension that [appellant] was about to apply force." Appellant asserts that Mellott's testimony merely "established that she was dealing with an annoyed, rude, and demanding customer. Nothing she testified to would lead a *reasonable* person to apprehend force or fear for her life[.]" (Emphasis in original). Appellant maintains that Mellott's " 'fear for her life' was completely unreasonable[,]" as evinced by Mellott's failure to press her cash register's alarm button or alert her coworker, who although she was in the watch repair room directly behind the sales counter, never came to Mellott's aid or called the police. Appellant contends that Screen "failed to add anything to prove that a robbery had taken place" because she was not concerned enough to call the police between receiving Mellott's call and arriving at the store.

Appellant contends that there was insufficient evidence to sustain a conviction for second-degree assault because "no reasonable person would have apprehended an imminent battery under the facts present here." Appellant argues that, "[f]or the same reason that it was not reasonable for [ ] Mellott to fear the use of force by [appellant], it was also not reasonable for [ ] Mellott to be frightened for purposes of proving second degree assault of the intent to frighten variety."

Appellant contends that there was insufficient evidence to sustain a conviction for obtaining property by use of a stolen credit card because "[t]here was absolutely no evidence that [appellant] violated [C.L.] § 8–204 [theft of a credit card or

receipt of a stolen credit card] or [C.L.] § 8–205 [counterfeit-ing of a credit card] as required for a conviction under [C.L.] § 8–206(a) [obtaining property by use of a stolen credit card]. Nor was there any evidence to establish that [appellant] used a credit card that he knew to be counterfeited." [19]

The State responds that the evidence was sufficient to support convictions as to all counts. It contends that there was sufficient evidence of robbery because Mellott's and Screen's testimony established that appellant "obtained the rings by intimidation." The State argues that there was sufficient evidence of second-degree assault because "[t]he testimony regarding [appellant]'s words, actions, and demean-or showed that the victim's fear was reasonable and the jury could infer an intent to frighten on that basis." The State asserts that appellant "failed to articulate at trial the grounds that he now asserts on appeal, [and] has failed to preserve his claim of error regarding the sufficiency of [the] evidence for obtaining property by" use of a stolen credit card. Alterna-tively, the State maintains that there was sufficient evidence of obtaining property by use of a stolen credit card because "the jury could have inferred that [appellant] used a credit card in violation of [C.L. § 8–204 (theft of a credit card or receipt of a stolen credit card) ] by receiving the stolen credit card number from his companion and using it to obtain the rings."

### (2) Standard of Review

In *Morris v. State,* 192 Md.App. 1, 30–31, 993 A.2d 716 (2010), this Court explained the standard of review for the sufficiency of the evidence to support a conviction, stating:

---

**19.** Within his argument regarding sufficiency of the evidence, appellant contends that, in instructing the jury as to obtaining property by use of a stolen credit card, the circuit court "did not even inform the jury that" the violation of either C.L. § 8–204 (theft of a credit card or receipt of a stolen credit card) or C.L. § 8–205 (counterfeiting of a credit card) was an element of violating C.L. § 8–206(a) (obtaining property by use of a stolen credit card). The issue of the jury instruc-tions is distinct from the issue of the sufficiency of the evidence. None of appellant's questions for our consideration concern the jury instruc-tions. Thus, we do not address any issue as to the jury instructions.

In reviewing a challenge to the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the prosecution in order to determine whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We defer to the fact-finder's decisions on which evidence to accept and which inferences to draw when the evidence supports differing inferences. In other words, we give deference to all reasonable inferences [that] the fact-finder draws, regardless of whether ... [we] would have chosen a different reasonable inference. In our independent review of the evidence, we do not distinguish between circumstantial and direct evidence because [a] conviction may be sustained on the basis of a single strand of direct evidence or successive links of circumstantial evidence.

(Alterations, emphasis, and omission in original) (citations and internal quotation marks omitted).

### (3) Law

#### (a) Preservation of the Issue of the Sufficiency of the Evidence

■■ Maryland Rule 4–324(a) provides in pertinent part: A defendant may move for judgment of acquittal on one or more counts ... at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state **with particularity all reasons** why the motion should be granted.

(Emphasis added). "Under [Maryland] Rule 4–324(a), a defendant is ... required to argue precisely the ways in which the evidence should be found wanting and the particular elements of the crime as to which the evidence is deficient." *Fraidin v. State,* 85 Md.App. 231, 244–45, 583 A.2d 1065, *cert. denied,* 322 Md. 614, 589 A.2d 57 (1991). "[A] motion which merely asserts that the evidence is insufficient to support a conviction, without specifying the deficiency, does not comply with [Maryland] Rule [4–324(a),] and thus does not preserve the issue of sufficiency for appellate review." *Brooks v. State,*

68 Md.App. 604, 611, 515 A.2d 225 (1986), *cert. denied,* 308 Md. 382, 519 A.2d 1283 (1987) (citation omitted). "[F]ailure to particularize the reasons for granting a motion for judgment of acquittal in accordance with [Maryland Rule 4–324(a)]'s requirements necessarily would result in a failure to preserve the issue for appellate review." *Muir v. State,* 308 Md. 208, 219, 517 A.2d 1105 (1986).

### (b) Sufficiency of the Evidence as to Robbery

In *Spencer v. State,* 422 Md. 422, 428–30, 30 A.3d 891 (2011), the Court of Appeals explained that robbery in Maryland stems from the common law, and is distinguished from mere theft by the element of force, whether actual or threatened. The Court stated:

Robbery in Maryland is governed by a common law standard.... From [robbery's] earliest days in Maryland law, fear has been a central component in distinguishing the crime of larceny or theft from robbery.

. . .

The hallmark of robbery, which distinguishes it from theft, is the presence of force or threat of force, the latter of which also is referred to as intimidation.

. . .

Where ... it is clear that the victim was neither intimidated [n]or put in fear, there must be evidence of actual violence preceding or accompanying the taking. * * * [T]he mere force that is required to take possession, when there is no resistance, is not enough, *i.e.,* the force must be more than is needed simply to move the property from its original to another position; there must be more force than is required simply to effect the taking and asportation of the property. Thus, it is not robbery to obtain property from the person of another by a mere trick, and without force ... nor is it robbery to suddenly snatch property from another when there is no resistance and no more force, therefore, than is necessary to the mere act of snatching.

*Id.* (some omissions in original) (citations and internal quotation marks omitted).

"The determination of whether there has been an intimidation should be guided by an objective test focusing on the accused's actions. . . . '[B]y intimidation' means . . . in such a way that would put an ordinary, reasonable person in fear of bodily harm." *Id.* at 432, 30 A.3d 891 (citations omitted). For example, in *Spencer*, the Court of Appeals held that the evidence was insufficient to support a conviction for robbery where the defendant, who never displayed a weapon, "entered an automobile service center and stated to the cashier: 'Don't say nothing.'" *Id.* at 425–26, 30 A.3d 891. The Court held that "[t]here was no evidence that Spencer conducted himself in a manner that could cause apprehension in a reasonable person that the petitioner was about to apply force." *Id.* The Court stated:

> The only thing said by the defendant in this case was the statement by [the defendant] not to say anything. This brief statement, by itself, would not cause an ordinary, reasonable person to have felt apprehension that [the defendant] was about to apply force. A reasonable person in the cashier's shoes on the day that [the defendant] entered the Jiffy Lube service center, when faced with the statement not to say anything, would not automatically hand over the cash register drawer. A reasonable person would have likely queried what [the defendant] wanted or what he meant when he said, "Don't say nothing." The statement to remain silent was simply not enough to create apprehension that force was about to be applied. To intimidate or threaten an individual to the extent necessary for the legal standard of robbery, something more is needed.

*Id.* at 436, 30 A.3d 891.

Similarly, in *West v. State*, 312 Md. 197, 199, 207, 539 A.2d 231 (1988), the Court of Appeals held that the evidence was insufficient to support a conviction for robbery where the defendant simply snatched the victim's pocketbook and ran. The Court stated:

[T]he mere snatching or sudden taking away of the property from the person of another does not constitute sufficient force, violence, or putting in fear to support a robbery conviction.

. . .

[T]he victim here was never placed in fear; she did not resist; she was not injured. The only force applied was that necessary to take the pocketbook from her hand. . . . A fair reading of her testimony supports only one conclusion— that she was not aware she had been dispossessed of the purse until she saw the purse snatcher running from her.

*Id.* at 206–07, 539 A.2d 231 (citations omitted).

In contrast, in *Dixon v. State*, 302 Md. 447, 464, 488 A.2d 962 (1985), the Court of Appeals held that the evidence was sufficient to support a conviction for assault with intent to rob where:

[T]he defendant with a "cold, hard look" in his eyes approached the cashier with a previously written demand for all her money, in the night, at a time when she was alone in the filling station and carrying a newspaper tightly under his arm, folded in such a way that the cashier "thought it was a weapon inside the newspaper, that he kept still, pointed right towards [her]."

(Second alteration in original).

Similarly, in *Coles v. State*, 374 Md. 114, 129, 821 A.2d 389 (2003), the Court of Appeals held that the evidence was sufficient to support a conviction for robbery where:

During the first robbery, [the defendant] entered the bank wearing a baseball hat, a scarf around his neck, and a jacket or heavy shirt in which he could have concealed a weapon. He walked up to [the victim, a bank teller,] and gave her a bag and a note telling her to "put some money in the bag," and ordering her "not to hit an alarm . . . not to let anybody know," and to return the note. That note constituted an unequivocal demand for money and an intimidating command not to let anyone know that [the defendant] was stealing the money.

Although the defendant did not display a weapon, the Court noted that "possession of an undisclosed weapon may be inferred from the surrounding facts and circumstances." *Id.* at 128, 821 A.2d 389 (citation and internal quotation marks omitted).

### (c) Sufficiency of the Evidence as to Second–Degree Assault

In *Hill v. State,* 134 Md.App. 327, 355–56, 759 A.2d 1164, *cert. denied,* 362 Md. 188, 763 A.2d 735 (2000), this Court explained that second-degree assault in Maryland stems from the common law, and is recognized in two forms. This Court stated:

[S]econd degree assault ... encompasses the common law offenses of assault, battery, and assault and battery. Maryland recognizes two forms of assault: (1) an attempt to commit a battery or (2) an intentional placing of another in apprehension of receiving an immediate battery. Assault of the intentional threatening variety is a fully consummated crime once the victim is placed in reasonable apprehension of an imminent battery. All that is required in terms of perception is an apparent present ability from the viewpoint of the threatened victim.

*Id.* (citations and internal quotation marks omitted).

In *Hill,* this Court held that the evidence was sufficient to support a conviction for second-degree assault of the intentional threatening variety where:

[The victim, a mathematics instructor,] testified that [the defendant] demanded that [the victim] give him an A for the class or [the defendant] would kill him, and then raised his jacket to display a gun in a holster. [The defendant] then detailed the manner in which he would dispose of [the victim]'s body. [The victim] stated that he experienced immediate fear for his life and that he had no idea what was going on or what he should do. He explained his efforts to disavow responsibility for [the defendant]'s grade and to keep [the defendant] from becoming violent, and expressed his concern, upon [the victim's officemate]'s return, that the

situation would get out of hand and that he and/or [the victim's officemate] might be shot. He conveyed how, after [the defendant] left his office, he was afraid to use the telephone or to walk into the hallway, for fear that [the defendant] might hear him call the police or question where he was going. Based on this evidence, a rational trier of fact could conclude that, when [the defendant] displayed the gun and threatened [the victim], [the victim] was placed in reasonable apprehension of an imminent battery, even though the words that [the defendant] used constituted a threat of harm to occur conditionally and in the future.

*Id.* at 356, 759 A.2d 1164.

In contrast, in *Harrod v. State,* 65 Md.App. 128, 138, 499 A.2d 959 (1985), this Court held that the evidence was insufficient to support a conviction for second-degree assault of the intentional threatening variety where:

[The defendant] swung a hammer which struck the wall "not too far from" [the victim]. Significantly, there is no evidence that [the victim] was harmed.

. . .

There is ... insufficient evidence that appellant, by an unlawful intentional act, placed [the victim] in reasonable apprehension of receiving an immediate battery. By definition the victim must be aware of the impending contact. This is consistent with the tort theory of assault.

There is no evidence in the record before us that [the victim] was in fact aware of the occurrences in his home on the morning in question.

(Citations omitted).

### (d) Stolen Credit Card Statutes

C.L. § 8–206(a)(1) prohibits obtaining property by use of a stolen credit card and provides, in pertinent part:

A person may not for the purpose of obtaining money, goods, services, or anything of value, and with the intent to

defraud another, use: ... a credit card obtained or retained **in violation of** § 8–204 or § 8–205 [20] of this subtitle[.] (Emphasis added). C.L. § 8–204 prohibits credit card theft and provides, in pertinent part:

(a) Taking credit card from another; receiving credit card taken from another with intent to sell.—

(1) A person may not:

(i) take a credit card from another, or from the possession, custody, or control of another without the consent of the cardholder; or

(ii) with knowledge that a credit card has been taken under the circumstances described in item (i) of this paragraph, receive the credit card with the intent to use it or sell or transfer it to another who is not the issuer or the cardholder.

(2) A person who violates this subsection is guilty of credit card theft.

\* \* \*

(d) Receiving credit card with knowledge of credit card theft or other violations.—A person other than the issuer may not receive a credit card that the person knows was taken or retained under circumstances that constitute:

(1) credit card theft[.]

### (4) Analysis

### (a) Robbery

 Returning to the instant case, viewing the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to support the conviction for robbery

---

**20.** C.L. § 8–205 prohibits credit card counterfeiting. According to the instant case's Information, the State charged appellant with two counts violating C.L. § 8–206(a) by "us[ing] a credit card issued to Joan Lamoy ... knowing the said card to have been stolen[.]" Thus, the statute that underlay the conviction pursuant to C.L. § 8–206(a) was C.L. § 8–204 (credit card theft), not C.L. § 8–205 (credit card counterfeiting). We address neither C.L. § 8–205 nor C.L. § 8–206(a)(2) (obtaining property by use of a counterfeited credit card).

because appellant acted "in such a way that would put an ordinary, reasonable person in fear of bodily harm." *Spencer,* 422 Md. at 432, 30 A.3d 891 (citation omitted). Appellant told Mellott "to stand in a certain spot" and to keep her hands above the counter, where he could see them. Whenever Mellott moved her hands, appellant became "hostile." Although Mellott was not supposed to charge a credit card number without seeing the customer's credit card or identification—and Mellott "continuously asked [appellant] for his ID telling him [she] could not do it"—appellant "kept saying, 'You're going to do this' " and told Mellott that she "had to do it." According to Mellott, appellant's voice was very "angry" and "very strong and loud. He was very demanding of [her] to do exactly what he said. Not to leave the area." Because of appellant's actions, Mellott was "scared for [her] life" and did not feel that she was free to leave the area. Appellant told Mellott: "You typed in the wrong number. Give it to me. I'll do it[,]" when Mellott entered the credit card number incorrectly. Appellant told Screen, "[d]on't waste the energy, hang up the phone[,]" when the manager, Screen, called the credit card company.

Appellant's actions were far beyond those of what he describes on brief as "an annoyed, rude and demanding customer." According to Screen—who had been working at the store since 1999 and had dealt with difficult customers before— appellant went beyond being a difficult customer. Although a rude customer might insist that a sales associate ring up a transaction, appellant told Mellott "to stand in a certain spot" and to keep her hands above the counter, where appellant could see them.

 Mellott could reasonably have believed that appellant possessed a weapon, which he would use if Mellott did not comply with appellant's demands. *See Coles,* 374 Md. at 128, 821 A.2d 389 ("[P]ossession of an undisclosed weapon may be inferred from the surrounding facts and circumstances." (Citation omitted)). Appellant was accompanied by two other individuals, thus outnumbering Mellott and her nearest co-

worker. Although appellant and his two companions did not display a weapon, Mellott could reasonably have believed that appellant and his two companions had the ability to cause Mellott an immediate battery with their bare hands. Mellott's belief in such a possibility was reasonable, given appellant's continual demands of her and his "angry[,]" "strong[,] and loud" voice. Evidence is sufficient to support a finding of intimidation where a defendant approaches a victim and, using a threatening tone or threatening body language, makes demands of the victim. *See Dixon,* 302 Md. at 464, 488 A.2d 962 (The Court of Appeals held that the evidence was sufficient to support a finding of intimidation where the defendant, according to victim, had "a cold, hard look" in his eyes.).[21] Under the instant circumstances, the jury could reasonably have found that appellant intimidated Mellott.

We find unpersuasive appellant's argument that the facts show that Mellott's and Screen's apprehension was unreasonable because Mellott did not press the cash register's alarm button or alert her coworker in the room behind her, and Screen did not call the police between receiving Mellott's call and arriving at the store. The standard for determining whether intimidation is sufficient to constitute robbery turns on how "an ordinary, reasonable person" would react to the defendant's actions, not how the actual victim reacted to the defendant's actions. *Spencer,* 422 Md. at 432, 30 A.3d 891 (citation omitted). Because the standard is objective, not subjective, the details concerning Mellott's reactions to appellant's demands are not dispositive. Because Screen was not

---

**21.** In contrast, evidence is insufficient to support a finding of intimidation where a defendant, although making a demand of a victim, does not use a threatening tone or threatening body language, *see Spencer,* 422 Md. at 425, 30 A.3d 891 (The Court of Appeals held that the evidence was insufficient to support a finding of intimidation where the defendant simply told the victim, "[d]on't say nothing."), or where a defendant makes no demands at all and simply takes a victim's belongings. *See West,* 312 Md. at 199, 539 A.2d 231 (The Court of Appeals held that the evidence was insufficient to support a finding of intimidation where the defendant simply snatched the victim's pocketbook without making any demands whatsoever.). In contrast, here, appellant made demands of Mellott, and he did so using a threatening tone.

the robbery's victim, whether she could reasonably have been intimidated is not relevant. Based on all of the above, a rational trier of fact could have determined beyond a reasonable doubt that the facts were sufficient to support the conclusion that appellant robbed Mellott.

## (b) Second–Degree Assault

Viewing the evidence in the light most favorable to the State, we conclude that there was sufficient evidence to support the conviction for second-degree assault because appellant had "an apparent present ability [to cause an immediate battery] from the viewpoint of the threatened victim." *Hill,* 134 Md.App. at 355–56, 759 A.2d 1164. Appellant demanded that Mellott ring up a transaction even though he lacked a credit card or identification. As discussed above, although appellant did not display a weapon, Mellott could reasonably have inferred that appellant possessed an unseen weapon, or that appellant and his two companions had the ability to cause Mellott an immediate battery with their bare hands. Evidence is sufficient to support a conviction for second-degree assault where a defendant enters a victim's workplace and demands threateningly that the victim take a certain action within the scope of the victim's employment. *See Hill, id.* at 356, 759 A.2d 1164 (This Court held that the evidence was sufficient to support a conviction for second-degree assault where the defendant demanded that the victim, a mathematics instructor, give the defendant an A in a course or the defendant "would kill him, and then [the defendant] raised his jacket to display a gun in a holster. [The defendant] then detailed the manner in which he would dispose of [the victim]'s body."). Based on all of the above, a rational trier of fact could have determined beyond a reasonable doubt that the facts were sufficient to support the conclusion that appellant assaulted Mellott in the second degree.

## (c) Obtaining Property by Use of a Stolen Credit Card

Preliminarily, we conclude that the issue of sufficiency of the evidence to support the conviction for obtaining proper-

ty by use of a stolen credit card is not preserved for appellate review. During the motion for judgment of acquittal, Maryland Rule 4–324(a) required appellant to "state with particularity all reasons why" the evidence was insufficient as to obtaining property by use of a stolen credit card. Appellant's counsel, however, simply stated: Counts "6, 7, 8, and 9 [we] also submit with the argument that we don't believe there has been legally sufficient evidence as far as all the elements that are required under the obtaining property by theft or misrepresentation[.]" In the motion for judgment of acquittal, appellant's counsel: "merely assert[ed] that the evidence [was] insufficient to support a conviction, without specifying the deficiency, [did] not comply with [Maryland] Rule [4–324(a),] and thus [did] not preserve the issue of sufficiency for appellate review." *Brooks,* 68 Md.App. at 611, 515 A.2d 225 (citation omitted).

■ Alternatively, viewing the evidence in the light most favorable to the State, we are satisfied that there was sufficient evidence to support the conviction for obtaining property by use of a stolen credit card. Although Mellott "continuously asked [appellant] for his ID" and told appellant that she could not charge a credit card number without seeing identification and an actual credit card, appellant never produced identification or an actual or purported credit card. Instead, appellant's male companion left the jewelry store, spoke on a cell phone, and returned with a piece of paper with a credit card number and an expiration date written on it, which appellant then forced Mellott to use for the transaction. In either that month or the next—in June or July 2008—one of Lamoy's credit cards was declined, and her credit card company told her that the credit card had been used to make large purchases at a jewelry store. Lamoy testified that she had never given anyone permission to use her credit card number. In July 2008, Maketa—King's Jewelry Store's point of sale coordinator—was contacted by Heartland Payment Systems, King's Jewelry Store's credit card processor. Heartland Payment Systems informed Maketa that it believed that the credit

cardholder had not authorized the two charges at King's Jewelry Store, and asked Maketa's office to investigate.

All of the evidence makes clear the following sequence of events, which the jury could reasonably have inferred.[22] (1) An unknown person, without Lamoy's knowledge, somehow learned Lamoy's credit card number and expiration date. (2) On June 8, 2008, appellant and his two companions entered King's Jewelry Store. (3) Appellant's male companion briefly exited the jewelry store, spoke on his cell phone with an unknown person who knew Lamoy's credit card number and expiration date, wrote down this information on a piece of paper, re-entered the jewelry store, and gave the paper to appellant. (4) Appellant, fully aware that he lacked the credit cardholder's authorization, forced Mellott to enter the credit card number and expiration date and refused to produce identification or an actual or purported credit card.

 Although we find no case in which a Maryland appellate court has ruled on the sufficiency of the evidence as to obtaining property by use of a stolen credit card, we hold that evidence is sufficient to support a conviction for obtaining property by use of a stolen credit card where the evidence shows that a defendant obtained goods or services by using, without the credit cardholder's permission, a credit card number that did not belong to the defendant.[23] Based on all of the above, a rational trier of fact could have determined beyond a reasonable doubt that the facts were sufficient to support the conclusion that appellant obtained property by use of a stolen credit card.

---

22. "[W]e give deference to all reasonable inferences [that] the fact-finder draws[.]" *Morris,* 192 Md.App. at 30–31, 993 A.2d 716 (citation and internal quotation marks omitted) (second alteration in original).

23. C.L. § 8–201(c)(2)(iii)1 provides in pertinent part: " **'Credit card'** **includes** ... **[an] account number[.]**" (Emphasis added). Thus, that appellant used only a credit card number, without an actual or purported credit card, is not relevant.

## III.

### A. Multiplicity

#### (1) Contentions

Appellant contends that the circuit court erred in entering two judgments of conviction each for theft, unauthorized use or disclosure of a credit card number, and obtaining property by use of a stolen credit card because "there was but a single transaction." Appellant argues that, pursuant to the " 'single larceny' doctrine ... there was but one single scheme or course of conduct thereby precluding two convictions and sentences for" theft and obtaining property by use of a stolen credit card. Appellant asserts that "[t]he rings that were stolen were part of a bridal set and were not sold separately. Thus, there was a single taking." Appellant maintains that the two counts of unauthorized use or disclosure of a credit card number "also arose out of a single use of a credit card number." Appellant contends that, "[j]ust because the sales-person had to manually enter the same credit card number two times in order for [appellant] to obtain the bridal set, does not amount to two 'disclosures' under" C.L. § 8–214.[24]

The State responds that appellant's "sentences are not illegal and [appellant] failed to raise any contention regarding [multiplicity[25]] below[; thus], this claim is not properly before

---

**24.** Within his argument regarding multiplicity and merger—which we discuss separately in Part III.A and Part III.B, respectively—appellant contends that the circuit court, in instructing the jury as to unauthorized use or disclosure of a credit card number, referred only to "disclosure" and not "use." The issue of the jury instructions is distinct from the issues of multiplicity and merger. As stated earlier, none of appellant's questions for our consideration on appeal concern the jury instructions.

**25.** We substitute "multiplicity" for the State's brief's language, "merger of sentences[,]" because, although the parties discussed the two issues together, we distinguish appellant's argument regarding **multiplicity**— that appellant should have received fewer **convictions**—from appellant's argument regarding **merger**—that appellant should have received fewer **sentences.** We discuss the argument regarding multiplicity here in Part

this Court." Alternatively, the State contends that appellant was properly convicted of two counts of unauthorized use or disclosure of a credit card number because "two uses of the credit card [number] were necessary in order for the payment for the rings to be completed." The State concedes that, if appellant's argument regarding multiplicity is preserved for appellate review, appellant should have incurred only one conviction and sentence each for theft and obtaining property by use of a stolen credit card.[26]

## (2) Law

### (a) Preservation of the Issue of Multiplicity

 "Multiplicity is the charging of the same offense in more than one count." *Brown v. State*, 311 Md. 426, 432 n. 5, 535 A.2d 485 (1988) (citation omitted).[27] In *Moore v. State*, 198 Md.App. 655, 674 n. 5, 18 A.3d 981 (2011), this Court held that the defendant, by failing to file a pretrial motion, forfeited her right to review of the issue of multiplicity in the charging document. This Court stated:

[The defendant] also appears to argue that the criminal information was defective for improperly charging her with multiple violations of one criminal offense, to wit, possessing counterfeit currency, issuing counterfeit currency, and theft. The State responds that, because [the defendant] did not file a mandatory pre-trial motion in accordance with Maryland Rule 4–252(a)(2) [28] and (b), she waived her challenge to any

III.A, and we discuss the argument regarding merger infra in Part III.B.

26. Although the State's concession does not bind us, *see Sanders*, 66 Md.App. at 595 n. 1, 505 A.2d 557, we agree with the State's conclusion that appellant should have incurred one conviction for theft and one conviction for obtaining property by use of a stolen credit card.

27. Multiplicity is not to be confused with duplicity, which is "the joinder of two or more distinct and separate offenses in the same count." *Cooksey v. State*, 359 Md. 1, 7, 752 A.2d 606 (2000) (citation and internal quotation marks omitted). Duplicity is not at issue here.

28. Maryland Rule 4–252(a)(2) governs mandatory motions in criminal cases and provides, in pertinent part:

alleged improper charging document. We agree with the State and hold that [the defendant]'s multiplicity argument regarding the charging document has not been preserved for appellate review.

> When the State charges multiple counts for a single offense, the charging document is multiplicitous.... Because [the defendant] in the instant case did not file a mandatory motion in accordance with [Maryland] Rule 4–252, her multiplicity argument in reference to the charging document is deemed waived. [The defendant], however, may challenge her *convictions* on multiplicity grounds.

*Id.* (emphasis in original) (citations omitted).

In *Webb v. State,* 185 Md.App. 580, 590, 598, 971 A.2d 949 (2009), this Court, despite the defendant's failure to object below, "exercise[d] our plenary discretion to review the propriety of the trial court's refusal to apply the single larceny doctrine." [29] This Court reversed the trial court's judgments of conviction and sentences for three counts of theft and "remanded with instructions to enter judgment of conviction for a single larceny and to resentence [the defendant] on the single larceny count." *Id.* at 582, 606, 971 A.2d 949. This Court stated:

> On numerous occasions this Court has pointed out that "illegal sentences may be challenged at any time, even on appeal[.]" ... *See, e.g., Jordan v. State,* 323 Md. 151, 161, 591 A.2d 875, 880 (1991) (even though the defendant did not

---

In the circuit court, the following matters shall be raised by motion in conformity with this Rule and if not so raised are waived unless the court, for good cause shown, orders otherwise: ... [a] defect in the charging document other than its failure to show jurisdiction in the court or its failure to charge an offense[.]

**29.** Although the defendant did not object, the trial court still addressed the issue of the single larceny doctrine because the Division of Parole and Probation, after a pre-sentence investigation at the trial court's request, "did not treat the three theft counts separately[.]" *Id.* at 589, 971 A.2d 949. The State "took issue with the [Division's] treatment of the theft counts as a single event[.]" *Id.* Without any input from the defendant, the trial court declined to apply the single larceny doctrine. *Id.* at 598, 971 A.2d 949.

raise the issue at trial, "Jordan has not waived his right to object to the unlawful sentence"); *Osborne v. State,* 304 Md. 323, 326 n. 1, 499 A.2d 170, 171 n. 1 (1985) ("where the trial court has allegedly imposed an illegal sentence, the issue may be reviewed on direct appeal even if no objection was made in the trial court")[.]

*Id.* at 598, 971 A.2d 949 (some citations omitted).

### (b) Challenges to Convictions on the Grounds of Multiplicity

In *Brown,* 311 Md. at 431–32, 535 A.2d 485 (1988), the Court of Appeals explained challenges to convictions on the grounds of multiplicity, stating:

The Double Jeopardy Clause protects a criminal defendant against . . . multiple punishment for the same offense. Multiple punishment challenges generally arise in one of two broad contexts:

"(a) A statute or a portion thereof proscribes designated conduct, and the question is whether the defendant's conduct constitutes more than one violation of this proscription. Thus, murdering two people simultaneously might well warrant two punishments but stealing two one-dollar bills might not. (b) Two statutes or **two portions of a single statute proscribe certain conduct, and the question is whether the defendant can be punished twice because his conduct violates both proscriptions.** Thus, selling liquor on a Sunday might warrant two punishments for violating a prohibition law and a blue law, but feloniously entering a bank and robbing a bank, though violative of two statutes, might warrant but a single punishment."

. . .

Whether a particular course of conduct constitutes one or more violations of a single statutory offense affects an accused in three distinct, albeit related, ways: multiplicity

in the indictment or information, multiple convictions for the same offense, and multiple sentences for the same offense. All three turn on the unit of prosecution of the offense and this is ordinarily determined by reference to legislative intent.

(Emphasis added) (citations omitted).

### (c) The "Single Larceny" Doctrine

In *Kelley v. State*, 402 Md. 745, 756, 939 A.2d 149 (2008), the Court of Appeals explained the "single larceny" doctrine, stating:

[W]hen considering whether the theft of multiple items of property, at the same time or at different times, from the same owner or from different owners, constitutes one offense or separate offenses (and with that, whether the value of the different items can be aggregated or not aggregated), the ultimate criterion is whether the separate takings were part of a single scheme or continuing course of conduct. If so, one offense must be charged and the values may be aggregated to determine whether the offense is a felony. To the extent that is not the case, the takings constitute separate offenses and aggregation of values is permissible only with respect to the takings included in each of the respective separate offenses.

... [T]he determination of whether multiple takings were part of a single scheme or course of conduct, for any purpose other than resolving the sufficiency of the charging document, is a factual matter that must be based on evidence. We observed there that the single larceny doctrine "rests on the notion that the separate takings are all part of a single larcenous scheme and a continuous larcenous act, and, *when the evidence suffices to establish that fact, directly or by inference,* most courts have had no problem applying the doctrine." The question, then, is whether the State has sufficiently established beyond a reasonable doubt that

there was, or, in this case, was *not*, a single larcenous scheme or course of conduct.

(Emphasis in original) (citations and footnotes omitted).

## (3) Analysis

### (a) This Court's Authority to Review an Allegedly Illegal Conviction

Returning to the instant case, we initially note that an appellate court has the authority to review an allegedly illegal conviction regardless of whether or not an objection is made at trial. *See Brown*, 311 Md. at 431 n. 4, 535 A.2d 485 (The Court of Appeals reviewed the defendant's claim of multiplicity despite the defendant's failure to object below.); *Webb*, 185 Md.App. at 598, 606, 971 A.2d 949 (This Court reviewed the defendant's claim of multiplicity and reversed the defendant's convictions despite the defendant's failure to object below.). Although, pursuant to Maryland Rule 4–252(a)(2), appellant forfeited the issue of review of the **charging documents,** appellant still "may challenge [his] *convictions* on multiplicity grounds[,]"[30] *Moore*, 198 Md.App. at 674 n. 5, 18 A.3d 981 (emphasis in original), without having raised the issue of multiplicity below. Thus, we exercise our plenary discretion to review the allegedly illegal convictions.[31]

---

**30.** Because appellant challenges the **convictions,** not the charging documents, we find unpersuasive the State's reliance of *Ford v. State*, 90 Md.App. 673, 694, 603 A.2d 883 (1992), aff'd, 330 Md. 682, 625 A.2d 984 (1993), *overruled in part by, Henry v. State*, 419 Md. 588, 19 A.3d 944 (2011) (This Court held that, pursuant to Maryland Rule 4–252(a), the defendant forfeited the right to appellate review by failing to object timely to the charging documents, which should have specified whether the defendant was charged with malicious destruction of property with a value of more than or less than $300.).

**31.** Although the State argues that appellant's convictions "are not illegal[,]" the State does not explain how convictions that are contrary to the single larceny doctrine are not illegal. The State seems to imply that appellant has not challenged the convictions on "substantive grounds[.]" We decline the State's invitation to treat the instant challenge as not being on substantive grounds.

### (b)(i) Convictions for Theft and Obtaining Property by Use of a Stolen Credit Card

██ We conclude that appellant and the State are correct that appellant should have received one conviction for theft, and one conviction for obtaining property by use of a stolen credit card. Mellott's testimony indicates the following sequence of events. (1) Appellant merely "pointed" at the first ring, without taking it. (2) Appellant forced Mellott to enter Lamoy's credit card number, but the $2,000 charge did not succeed because of the credit card's limit. (3) Appellant "chose" the second ring. (4) The two charges of $1,000 each succeeded. (5) **Appellant, for the first time, took both rings at once and left the jewelry store.** Although appellant took two rings, "the separate takings were part of a single scheme or continuing course of conduct[,]" *Kelley*, 402 Md. at 756, 939 A.2d 149, because appellant took both rings during the same visit to the same jewelry store. Pursuant to the "single larceny" doctrine, appellant should have incurred one conviction for theft, and one conviction for obtaining property by use of a stolen credit card. For all the reasons discussed above, we reverse the second conviction for theft ("Count Five") and the second conviction for obtaining property by use of a stolen credit card ("Count Seven"). We vacate the sentence for the second conviction for obtaining property by use of a stolen credit card ("Count Seven").[32]

### (b)(ii) Convictions for Unauthorized Use or Disclosure of a Credit Card Number

██ As to the convictions for unauthorized use or disclosure of a credit card number, we are satisfied that the circuit court did not err in entering two judgments of conviction. In the instant situation, "two portions of a single statute proscribe certain conduct, and the question is whether the defen-

---

32. Appellant received two convictions, but no sentences, for theft, which merged with robbery for sentencing purposes. As a result, the second conviction for theft ("Count Five") has no sentence for us to vacate.

dant can be punished twice because his conduct violates both proscriptions." *Brown,* 311 Md. at 431, 535 A.2d 485 (citation omitted). C.L. § 8–214(a) prohibits unauthorized use or disclosure of a credit card number and provides in pertinent part: "A person may not use or disclose any credit card number or other payment device number or holder's signature[.]" Thus, two portions of C.L. § 8–214(a) proscribe appellant's conduct: one portion bars **disclosing** another's credit card number, while the other portion bars **using** another's credit card number. Appellant took two actions, each of which was distinct-and thus independently punishable. (1) Appellant **disclosed** Lamoy's credit card number to Mellott when appellant showed Mellott the piece of paper with Lamoy's credit card number written on it. (2) Appellant **used** Lamoy's credit card number when appellant forced Mellott to enter Lamoy's credit card number. Although our reasoning differs from the State's when it charged appellant with two counts of violating C.L. § 8–214(a) [33]—as well as the State's reasoning on appeal [34]—

---

**33.** Presumably, the State charged appellant with two counts of violating C.L. § 8–214(a) because appellant took two rings and forced Mellott to charge Lamoy's credit card number twice. In contrast, we view the two credit card charges as a single "use" of Lamoy's credit card number—but we view separately appellant's act of "disclosing" Lamoy's credit card number to Mellott by showing her the piece of paper with Lamoy's credit card number written on it.

Two hypothetical situations prove that appellant could have violated one or the other of C.L. § 8–214(a)'s "use" or "disclosure" portions. (1) Appellant could have **disclosed** Lamoy's credit card number, without **using** it, by showing the piece of paper to Mellott—or anyone else, for that matter—and then leaving, without charging anything to Lamoy's credit card number. (2) Appellant could have **used** Lamoy's credit card number, without **disclosing** it, by forcing Mellott to set up the cash register so that it was ready for the credit card number's input, forcing Mellott to step away and look away, and then typing Lamoy's credit card number himself—ensuring that Mellott would not see Lamoy's credit card number.

Arguably, by using Lamoy's credit card number, appellant "disclosed" it to Heartland Payment Systems, King's Jewelry Store's credit card processor. If this were the case—and thus it would be impossible to "use" a credit card number without "disclosing" it—then the Maryland General Assembly would have had no reason for writing C.L. § 8–214(a) to prohibit both "use" **and** "disclosure." Instead, C.L. § 8–214(a) could have merely prohibited "disclosure" because, by defini-

that has no bearing on our conclusion that appellant was properly convicted of two violations of C.L. § 8–214(a). For all the reasons discussed above, we affirm the convictions for unauthorized use or disclosure of a credit card number.

## B. Merger

### (1) Contentions

Appellant contends that the circuit court erred in not merging, for sentencing purposes, the convictions for unauthorized use or disclosure of a credit card number with the conviction for obtaining property by use of a stolen credit card because unauthorized use or disclosure of a credit card number "includes the elements of" obtaining property by use of a stolen credit card.[35]

---

tion, using a credit card number would disclose it. We decline to interpret the word "use" in C.L. § 8–214(a) as being superfluous to the word "disclosure." *See Parker v. State*, 193 Md.App. 469, 499–500, 997 A.2d 912 (2010) ("If reasonably possible we read a statute so that no word, phrase, clause or sentence is rendered surplusage or meaningless, or superfluous or redundant." (Citations and internal quotation marks omitted)).

**34.** Although we conclude that the circuit court properly entered two judgments of conviction for unauthorized use or disclosure of a credit card number, we find unpersuasive the State's reliance on *Carter v. State*, 35 Md.App. 224, 370 A.2d 183, *cert. denied*, 280 Md. 728 (1977). In *Carter, id.* at 227–28, 370 A.2d 183, this Court held that the trial court properly entered three judgments of conviction pursuant to the statute that has since been re-codified as C.L. § 8–204(b) (receiving a credit card known to have been lost or misdelivered). Five credit cards, each with the same account number that belonged to Texaco, were accidentally delivered to the defendant, who was neither affiliated with Texaco nor the credit cards' intended recipient. *Carter*, 35 Md. App. at 225, 370 A.2d 183. The defendant kept some of the credit cards for future use and gave some to his employees. *Id.* Under *Carter*, a defendant may receive multiple convictions for misusing multiple credit cards in multiple ways. *Carter* is not dispositive where, as here, a defendant misuses only one credit card number in one transaction.

**35.** On brief, appellant refers to the conviction pursuant to C.L. § 8–214(a) as "the disclosure conviction" and the conviction pursuant to C.L. § 8–206(a) as "the use conviction." This distinction, however, applies C.L. § 8–214(a)'s language—"[u]nauthorized use or disclosure"—to both convictions. For clarity, we continue to refer to the

The State responds that appellant "failed to raise any contention regarding the merger of [convictions for sentencing purposes] below[; thus], this claim is not properly before this Court." Alternatively, the State contends that the circuit court properly refrained from merging, for sentencing purposes, the conviction for unauthorized use or disclosure of a credit card number with the conviction for obtaining property by use of a stolen credit card. The State argues that "the conduct of disclosing a credit card number and using a credit card number are not the same, as is evident from the statute which may be violated by either act of using the credit card number or disclosing the credit card number." We agree with the State on this point. *See supra* footnote 33.

### (2) Law

### (a) "Required Evidence Test" for Merger

In *Purnell v. State,* 375 Md. 678, 693–95, 827 A.2d 68 (2003), *superseded by statute on other grounds as stated in, Rich v. State,* 205 Md.App. 227, 44 A.3d 1063 (2012), the Court of Appeals explained the "required evidence test" for merger. The Court stated:

> Generally, this Court has relied upon the *Blockburger [v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) ] "required evidence test" in resolving double jeopardy challenges involving two offenses stemming from the same act or acts.

> We outlined the application of the required evidence test in *Williams [v. State,* 323 Md. 312, 593 A.2d 671 (1991) ] as follow[s]:

> . . .

> The required evidence test focuses upon the elements of each offense; if all of the elements of one offense are included in the other offense, so that only the latter

---

conviction pursuant to C.L. § 8–214(a) as "unauthorized use or disclosure of a credit card number" and the conviction pursuant to C.L. § 8–206(a) as "obtaining property by use of a stolen credit card."

offense contains a distinct element or distinct elements, the former merges into the latter. The test was explained in *Thomas v. State*, 277 Md. 257[,] 267 [353 A.2d 240 (1976) ] as follows:

> The required evidence is that which is minimally necessary to secure a conviction for each ... offense. If each offense *requires proof of a fact which the other does not*, or in other words, if each offense contains an element which the other does not, the offenses are not the same for double jeopardy and merger purposes, even though arising from the same conduct or episode. But, where only one offense requires proof of an additional fact, so that all elements of one offense are present in the other, the offenses are deemed to be the same for double jeopardy and merger purposes.

. . .

This does not end the inquiry, however, because the focus is upon the intent of the Legislature. [T]he *Blockburger* rule does not provide the final answer in cases involving multiple punishment because, when specifically authorized by the legislature, cumulative sentences for the same offense may under some circumstances be imposed after a single trial[ ]. In such instances, the appropriate measure of the allowable unit of prosecution would be what the legislature intended. Indeed, our primary task in a unit of prosecution analysis is to find and give effect to the legislative intent underlying the statute.

*Purnell*, 375 Md. at 693–95, 827 A.2d 68 (some citations, emphasis, and internal quotation marks omitted).

### (b) Rule of Lenity and Principle of Fundamental Fairness

In *Moore v. State*, 198 Md.App. 655, 686, 18 A.3d 981 (2011), this Court stated: "If the principles of double jeopardy are not implicated because the offenses at issue do not merge under the required evidence test, merger may still be required under the rule of lenity or the principle of fundamental

fairness." (Citation omitted). As to the rule of lenity, this Court stated:

> Even though two offenses do not merge under the required evidence test, there are nevertheless times when the offenses will not be punished separately. Two crimes created by legislative enactment may not be punished separately if the legislature intended the offenses to be punished by one sentence. It is when we are uncertain whether the legislature intended one or more than one sentence that we make use of an aid to statutory interpretation known as the "rule of lenity." Under that rule, if we are unsure of the legislative intent in punishing offenses as a single merged crime or as distinct offenses, we, in effect, give the defendant the benefit of the doubt and hold that the crimes do merge.

*Id.* (citation and internal quotation marks omitted). As to the principle of fundamental fairness, this Court stated:

> Considerations of fairness and reasonableness reinforce our conclusion [to merge].... We have ... looked to whether the type of act has historically resulted in multiple punishment. The fairness of multiple punishments in a particular situation is obviously important.
>
> * * *
>
> Implicit in this reasoning is the idea that when a single act is sufficient to result in convictions for both offenses, but the victim suffered only a single harm as a result of that act, then as a matter of fundamental fairness there should be only one punishment because in a real-world sense there was only one crime.

*Id.* at 686–87, 18 A.3d 981 (alteration and omissions in original) (citation omitted).

In *Jackson v. State,* 141 Md.App. 175, 198, 784 A.2d 670 (2001), *cert. denied,* 368 Md. 240, 792 A.2d 1177 (2002), this Court held that, although felony theft did not merge with robbery pursuant to the required evidence test:

> The rule of lenity dictate[d] merging the sentence for felony theft. **Both convictions were predicated on the taking of the same property from the same victim in a single**

**incident.** We cannot say that the legislature intended cumulative punishment in that circumstance; accordingly, the ambiguity must be resolved in the [defendant]'s favor.

(Emphasis added).

In *Moore v. State,* 163 Md.App. 305, 321, 878 A.2d 678 (2005), this Court held that the trial court erred in failing to merge, for sentencing purposes, a conviction for theft with a conviction for credit card theft (C.L. § 8–204). This Court stated: "[L]enity in determining the ambit of ambiguous criminal statutes is particularly appropriate where legislative history of a statute or the relationship between two statutory provisions is not clear." *Id.* at 320, 878 A.2d 678. As to the rule of lenity, this Court stated:

There is nothing in the legislative file that indicates that the General Assembly intended for dual convictions. There is no suggestion in either of the statutory provisions or legislative history or prior court opinions, that one of the purposes in establishing the offense of credit card theft was to compound the punishment for theft. Rather, it would appear reasonable that the credit card theft offenses were enacted to ensure that a credit card thief, who has possession of the physical credit card but has not used it for some reason or another, can still be prosecuted for theft, even though the physical card itself has very little intrinsic value. **The rule of lenity instructs that a court not interpret a . . . criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what [the legislature] intended.** Moreover, the General Assembly typically makes clear when it intends to allow dual convictions or consecutive sentences, and no such direction is present here.

*Id.* at 321, 878 A.2d 678 (emphasis added) (alteration and omission in original) (citation and internal quotation marks omitted).

### (3) Analysis

### (a) This Court's Authority to Review
### an Allegedly Illegal Sentence

 Returning to the instant case, we initially note that an appellate court "has the authority to review an allegedly illegal sentence regardless of whether an objection is made at trial[.]" *Brown*, 311 Md. at 431 n. 4, 535 A.2d 485. *See also Wilkins v. State*, 343 Md. 444, 445, 447, 682 A.2d 247 (1996) (The Court of Appeals reviewed the defendant's claim of merger despite the defendant's failure to object below.). Accordingly, we reject the State's contention that "this claim is not properly before this Court."

### (b)(i) Merger of the Convictions Pursuant
### to the "Required Evidence Test"

 Pursuant to the "required evidence test," the convictions for unauthorized use or disclosure of a credit card number ("Count Eight" and "Count Nine") would not merge, for sentencing purposes, with the conviction[36] for obtaining property by use of a stolen credit card ("Count Six"). The element of disclosure is present in C.L. § 8–214(a) (unauthorized use or disclosure of a credit card number), but absent from C.L. § 8–206(a)(1) (obtaining property by use of a stolen credit card). The element of using a stolen credit card for "the purpose of obtaining money, goods, services, or anything of value" is present in C.L. § 8–206(a)(1) (obtaining property by use of a stolen credit card) but absent from C.L. § 8–214(a) (unauthorized use or disclosure of a credit card number). As determined above, appellant took two separate actions that were independently punishable: disclosing Lamoy's credit card number and using Lamoy's credit card number to obtain property.[37] Applying the "required evidence" test, we are

---

**36.** We use the singular word "conviction" because we reverse the second conviction for obtaining property by use of a stolen credit card ("Count Seven"). *See supra* Part III.A.

**37.** It is true that, pursuant to our conclusion *supra* in Part III.A regarding multiplicity, appellant violated C.L. § 8–214(a) once by **dis-**

satisfied that it is untrue that "all elements of one offense" (unauthorized use or disclosure of a credit card number) "are present in the other" (obtaining property by use of a stolen credit card). *Purnell,* 375 Md. at 694, 827 A.2d 68 (citation and emphasis omitted).

### (b)(ii) Merger of the Convictions Pursuant to the Rule of Lenity and the Principle of Fundamental Fairness

 Upon careful consideration of the rule of lenity, the principle of fundamental fairness, and the instant case's unique circumstances, we conclude that the circuit court properly refrained from merging, for sentencing purposes, unauthorized use or disclosure of a credit card number ("Counter Eight" and "Count Nine") with obtaining property by use of a stolen credit card ("Count Six"). Appellant's convictions were not predicated on a single harm or taking of property from the same victim. Rather, appellant caused two distinct harms to two distinct victims—Lamoy and King's Jewelry Store. By obtaining property by use of a stolen credit card, appellant harmed King's Jewelry Store by depriving it of two rings, for which King's Jewelry Store received no payment. By committing unauthorized use and disclosure of a credit card number, appellant harmed Lamoy, the credit cardholder, by invading the sanctity of Lamoy's credit card number and making an

---

closing Lamoy's credit card number, and once more by **using** Lamoy's credit card number. Arguably, because one of the convictions pursuant to C.L. § 8–214(a) was for **use,** one of those convictions must, for sentencing purposes, merge with the one remaining conviction for obtaining property by **use** of a stolen credit card pursuant to C.L. § 8–206(a)(1).

Such an argument fails, however, because only the doctrine of **multiplicity** turns on a particular case's facts. In contrast, the doctrine of **merger** turns only on the elements contained in the two statutes in question—regardless of the particular case's facts. As a result, our analysis concerns only the language of C.L. § 8–214(a) (unauthorized use or disclosure of a credit card number) and C.L. § 8–206(a)(1) (obtaining property by use of a stolen credit card), rather than what appellant did or did not do. Examining these two statutes, we conclude that the element of disclosure and the element of "the purpose of obtaining money, goods, services, or anything of value" distinguish them, and prevent merger pursuant to the "required evidence" test.

unauthorized charge using Lamoy's credit card number. In Counts Six, Eight, and Nine, the Information identifies Lamoy as the victim. At sentencing, the circuit court ordered appellant to pay restitution to King's Jewelry Store. Lamoy and King's Jewelry Store suffered a distinct and separate harm—Lamoy had her credit card number used or disclosed without her authorization, leading to the declination of her credit card shortly after the use or disclosure, and King's Jewelry Store was deprived of both money and its merchandise. The rule of lenity and the principle of fundamental fairness apply where a defendant's convictions are "predicated on the taking of the same property **from the same victim** in a single incident." *Jackson,* 141 Md.App. at 198, 784 A.2d 670 (emphasis added); *see also Pineta v. State,* 98 Md.App. 614, 620–21, 634 A.2d 982 (1993) ("The relevant inquiry is whether the two offenses are of necessity closely intertwined or whether one offense is *necessarily* the overt act of the other." (Emphasis in original) (citation and internal quotation marks omitted)).

Upon review of the statutory scheme, it is clear that the General Assembly intended to punish the two crimes differently. C.L. § 8–206(a) is contained within "Part I. General Provisions" of subtitle 2, Credit Card Crimes, and C.L. § 8–214(a) is contained within "Part II. Credit Card Number Protection," of subtitle 2, Credit Card Crimes. Depending on the value of property obtained in violation of C.L. § 8–206(a), a defendant may be convicted and sentenced of either a felony or a misdemeanor. *See* C.L. § 8–206(c). In contrast, a defendant who violates C.L. § 8–214(a), contained within a part titled "Credit Card Number Protection," is guilty of a felony and subject to civil penalties and injunctions. *See* C.L. § 8–216 (criminal penalty); C.L. § 8–217 (civil penalty; injunction). The General Assembly plainly intended the crimes committed under the Credit Card Number Protection Part to be punished separately than the offense set forth in C.L. § 8–206(a).

For all the reasons discussed above, we conclude that the circuit court properly refrained from merging, for sentencing purposes, unauthorized use or disclosure of a credit card

number ("Counter Eight" and "Count Nine") with obtaining property by use of a stolen credit card ("Count Six").

SECOND CONVICTION FOR THEFT ("COUNT FIVE") AND SECOND CONVICTION FOR OBTAINING PROPERTY BY USE OF A STOLEN CREDIT CARD ("COUNT SEVEN") REVERSED. SENTENCE FOR THE SECOND CONVICTION FOR OBTAINING PROPERTY BY USE OF A STOLEN CREDIT CARD ("COUNT SEVEN") VACATED. ALL OTHER SENTENCES AND JUDGMENTS OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED. COSTS TO BE PAID 3/4 BY APPELLANT AND 1/4 BY WASHINGTON COUNTY.